THOMAS B. WHEATLEY & others *vs.* PLANNING BOARD
OF HINGHAM & others.[1]

Plymouth.   November 17, 1978. — April 20, 1979.

Present: KEVILLE, ROSE, & BROWN, JJ.

*Subdivision Control*, Plan, Municipal services, Streets.

Where a town's planning board, purporting to act under G. L. c. 41, § 81R, waived provisions of its rules and regulations requiring that existing and proposed municipal services be shown on a plan submitted for its approval and thereafter failed, in the letter accompanying its certificate of approval of the plan, explicitly to require the installation of various municipal services, the consequence of the purported waiver was that the developers' covenant under G. L. c. 41, § 81U, did not obligate them to install such services, and the waiver was thus "inconsistent with the intent and purpose of the subdivision control law" and improper, necessitating annulment of the board's approval of the plan. [437-444]

Failure of a subdivision plan to show all lots into which the developer proposed to divide the locus would not invalidate a planning board's approval of the subdivision of the locus into the lots actually shown on the plan. [444-446]

---

[1] Ernest Hanian and Francis Ventre.

This court did not consider whether a planning board, acting pursuant to G. L. c. 41, § 81R, could properly waive a provision of its rules and regulations requiring that a subdivision plan show "[l]ocation and species of proposed street trees" in a case where the waiver of the provision was unintended and the board's approval of the plan was annulled on other grounds. [446]

This court did not consider whether a planning board, acting pursuant to G. L. c. 41, § 81R, could properly waive a portion of its rules and regulations requiring that a subdivision plan show certain technical information concerning the design and layout of proposed ways, where the parties did not specify the respects in which the plan as submitted failed to meet such requirements. [447]

A requirement of the rules and regulations of a planning board that a subdivision plan include a map of the proposed topography of the locus was, in the circumstances, informational only, did not bind the developer to grade the locus in the manner shown on the map, and was waivable by the board pursuant to G. L. c. 41, § 81R. [447-448]

Where the record on an appeal from a decision of a planning board approving a subdivision plan did not make clear the respects in which the submitted plan omitted information concerning existing topographical features required by the board's rules and regulations, this court expressed no opinion whether the board, pursuant to G. L. c. 41, § 81R, could properly waive those requirements with which the plan did not comply. [448]

Where the record on an appeal from a decision of a planning board approving a subdivision plan showed that a proposed way had been approved on the basis of its being a "minor street," as defined in the board's rules and regulations, when in fact it was intended as a "secondary street" as there defined, and where the propriety of a purported waiver by the board of the more stringent requirements applicable to secondary streets had not been considered by the parties or the trial judge, this court did not decide whether the board, pursuant to G. L. c. 41, § 81R, could properly make such a waiver. [448-450]

A street containing a turnaround encompassing fourteen house lots at its closed end was a dead-end street. [450-451]

BILL IN EQUITY filed in the Superior Court on February 11, 1974.

The case was heard by *J. P. Sullivan,* J.

*Peter L. Puciloski (Bertram A. Sugarman* with him) for the plaintiffs.

*George M. Ford* for Brian McSweeney & others.

*Charles J. Beard* for Ernest Hanian & another.

KEVILLE, J. The plaintiffs, pursuant to G. L. c. 41, § 81BB, appealed from a decision of the defendant planning board of Hingham (board) approving upon conditions a plan for the subdivision of an eighty-eight acre tract of land in Hingham (locus) submitted in 1973 by the defendant Hanian.[2] The trial judge filed findings of fact pursuant to Mass.R.Civ.P. 52(a), 365 Mass. 816 (1974), and ordered that judgment enter stating that the board's decision was "not in excess of its authority and is affirmed." The plaintiffs appeal from the ensuing judgment. We reverse. The facts, as relevant, appear in the body of the opinion.

1. *Waiver of the Board's Rules and Regulations.*

In 1967 predecessors in title of Hanian, as trustee, submitted a plan for the subdivision of the locus which the board approved apparently subject to a condition that the improvements shown on the plan be completed within five years. In 1973, after the expiration of that five-year period and without the improvements having been completed, the board rescinded its approval of the plan.[3] Hanian thereupon discussed with the board the possibility of resubmitting the same subdivision plan his predecessors in title had submitted in 1967. However, in the interim between the approval and rescission of the 1967 plan the board had adopted a new set of rules and regulations pursuant to G. L. c. 41, § 81Q, and the 1967 plan did not meet various of the requirements contained in the new rules and regulations. At its May 14, 1973, meeting, the board agreed to waive, pursuant to G. L. c. 41, § 81R,[4] any procedural requirements which the 1967 plan did not

[2] In 1973 the locus was owned by Hanian as trustee of the Baker Hill Realty Trust. At an undisclosed time after the board approved the plan submitted in 1973, ownership of the locus was transferred to Hanian and Ventre as individuals.

[3] Hanian did not appeal from that rescission, and he and Ventre have not otherwise attacked its validity.

[4] Section 81R, as amended by St. 1955, c. 411, § 1, states in pertinent part: "A planning board may in any particular case, where such action

meet;[5] and on May 21 Hanian resubmitted two prints of the 1967 plan (each of which contained twenty-one sheets) together with a formal application for the plan's approval. In a covering letter Hanian's attorney conceded that the plan as submitted did not comply with seven separate provisions of the board's rules and regulations,[6] and the parties further agree that in addition it did not comply with at least four other provisions of the rules and regulations.[7]

The board accepted the plan as submitted, its minutes for its May 21 meeting stating "[e]verything appeared to be in order." The following June 18 the board held the public hearing on the plan required by G. L. c. 41, § 81T. During the course of that hearing the chairman of the board observed, "[T]here were certain procedural steps, only procedural steps, that we waived. We did not waive, at least to the best of my knowledge and understanding, any of the requirements of the Subdivision Control Law except for certain procedural steps that had to do with the preparation of the plan." The board never specified exactly which provisions of its rules and regulations it had purported to waive.

As a result, at least with respect to those violations of the rules and regulations not mentioned in the letter of Hanian's attorney, we cannot be certain whether the board purported to waive the regulations violated or simply failed to recognize the violations. We need not, how-

---

is in the public interest and not inconsistent with the intent and purpose of the subdivision control law, waive strict compliance with its rules and regulations."

[5] The minutes of that meeting state, "There was a discussion relative to procedural matters and it was agreed that the board would accept a copy of the plan previously approved, waiving certain requirements that these plans do not meet."

[6] These are paragraphs 1(a), 2(c), (f), (g), (l), (n), and (p) of § 3C.

[7] These are § 2C, and paragraphs 2(i), (k), and (o) of § 3C.

ever, decide whether the board's haphazard procedure in waiving its regulations requires the annulment of its approval of the plan.[8] Even assuming that the board intended to waive all the provisions of its rules and regulations with which the plan does not comply, those waivers were at least in part improper and require the annulment of the board's approval of the plan.

One of the provisions of the rules and regulations not mentioned in the letter of Hanian's attorney with which the parties agree the plan does not comply, was § 3C, par. 2(k). That provision requires that subdivision plans show "[a]ll existing and proposed municipal services and their appurtenances "; § 2A defines municipal services as "[s]ewers, surface and subsurface water drains, water pipes, fire hydrants, gas pipes, electric lines or ducts, telephone lines or ducts, fire alarm cables and boxes, street lights, and their respective appurtenances." A planning board has authority to make requirements for "the services that as a matter of course will be installed in the ways" even if furnished by a regulated utility rath-

---

[8] Our disapproval of the procedure followed by the board extends only to the failure to specify the provisions of its rules and regulations which it was waiving. We reject the plaintiffs' contention that the board was required to set forth in writing the findings upon which it based its determination that a waiver of strict compliance with those provisions was "in the public interest and not inconsistent with the intent and purpose of the subdivision control law" (see note 4, *supra*). The Subdivision Control Law is a carefully drafted, comprehensive statutory scheme. *Cassani* v. *Planning Bd. of Hull*, 1 Mass. App. Ct. 451, 458 (1973), and cases cited. When the board is required to set forth findings, such a requirement is explicitly stated. See, e.g., G. L. c. 41, § 81U. Since no such requirement appears in § 81R, we conclude that the board may waive its rules and regulations without setting forth in writing the findings it is required to make in order to do so. See *Lyman* v. *Planning Bd. of Winchester*, 352 Mass. 209, 213-214 (1967), in which the board's waiver of strict compliance with its rules and regulations was upheld in spite of its apparent failure to set forth in writing any findings supporting the waiver. The case of *Sansoucy* v. *Planning Bd. of Worcester*, 355 Mass. 647 (1969), is inapposite; it involves the interpretation of a provision of the board's rules and regulations rather than of § 81R.

er than the developer or the municipality. *Sansoucy* v. *Planning Bd. of Worcester*, 355 Mass. 647, 649 (1969). As approved by the board, the plan at best showed only surface and subsurface water drains.[9]

The board, in arguing that its waiver of so much of § 3C, par. 2(k), as was not complied with was "in the public interest and not inconsistent with the intent and purpose of the subdivision control law," relies on the board chairman's testimony to the effect that it is impracticable for the plans to show water pipes or electric ducts since ground conditions discovered in installing them may require that they be placed other than where they are shown on the plan. We assume that in such circumstances the board under § 81R may waive a requirement that such services actually be shown on the plan. But the difficulty with what the board has done in the present case[10] lies in the fact that, having waived the requirement that all municipal services be shown on the plan except with respect to the drainage system, the board failed to take sufficient steps to indicate what municipal services not shown on the plan the developers would be required to install. It did include in the letter accompanying its certificate of approval of the plan a condition that a "sanitary sewer system . . . be installed subject to the approval of the Sewer Commissioner" of Hingham, and we assume that its reference in that letter to electric power[11] was sufficient to require the installation of that service. But the board in its certificate of approval and accompanying letter specified no other municipal services which Hanian would be required to install. Municipal services not

[9] The board approved the plan subject to a condition that the drainage be revised as provided in another plan submitted to the board, and it requested that a clarification be made in that plan.

[10] Apart from the fact that there was no testimony as to the impracticability of showing on the plan the other services not shown.

[11] "We have information that leads us to believe that the requirement that power be buried should be adhered to, therefore, we could not vote to waive that requirement."

mentioned included water pipes, fire hydrants, telephone lines or ducts, fire alarm cables and boxes, and street lights. That the board intended to require the installation of at least some of those services is suggested by its chairman's testimony concerning the water pipes as well as by the fact that its waiver of its rules and regulations was supposed to have no substantive effect.

Nevertheless, the result of the board's waiver of the requirement that the plan show all municipal services is that the covenant contained in par. (g) of Hanian's application for approval of the plan,[12] by which the board as required by G. L. c. 41, § 81U, sought to secure the installation of municipal services (see *Stoneham v. Savelo*, 341 Mass. 456, 457, 458-459 [1960], and *Costanza & Bertolino, Inc. v. Planning Bd. of No. Reading*, 360 Mass. 677, 679-

---

[12] That paragraph, as relevant, reads: "The applicant [ ] covenant(s) and agree(s) for himself . . . and his heirs, executors, administrators, successors and assigns:

"(1) to construct and complete the proposed ways and all improvements shown on said plan as approved by the Board and to install the drainage system, water pipes, gas pipes and electric lines, and all other municipal services therein required by the board, within 24 months from the date of this application.

"(2) To construct and complete said ways and improvements and to install said municipal services, in accordance with all Rules and Regulations of the Board in force at the date of this agreement . . . .

"(3) The applicant [ ] request[s] that the Board approve the plan to which this application relates without requiring a bond, on condition that no lot in the subdivision shall be sold and no building shall be erected or placed on any lot therein until said ways and all improvements are completed and said municipal services are installed, in accordance with the specifications laid down by the Board, so as adequately to serve such lot, and he . . . agree(s) that in the event of such approval he . . . will obey and comply with such condition until performance with the requirements thereof is evidenced by a certificate of the Board.

"(4) That if this application is approved he . . . will cause the plan to which it relates to be recorded in the Registry of Deeds of Plymouth County or filed with the Recorder of the Land Court within thirty (30) days after such approval and that he . . . will not sell, or offer to sell, any of the lots within the subdivision until such plan is so recorded or filed, and/or an appropriate vote or endorsement of the Planning Board."

681 [1971]), does not oblige the developers to install any municipal services other than the drainage system, sewers, and possibly electricity. The phrase "therein required" in par. (g)(1) of Hanian's application clearly refers back to "said plan" and modifies not only "all other municipal services" but also "the drainage system, water pipes, gas pipes and electric lines." (See note 12, *supra.*) That is, the only municipal services Hanian has covenanted to install in par. (g)(1) are those shown on the plan or required by the certificate of approval and accompanying letter attached to the plan. The obligations undertaken by Hanian in pars. (g)(2)-(4) are only with respect to "said municipal services" referred to in par. (g)(1).

It is not clear whether the condition, set forth in the letter accompanying the board's certificate of approval, that the approval is "subject to a Covenant under . . . [G. L. c. 41, § 81U] to be recorded herewith" requires the execution of an additional covenant pursuant to § 3C, par. 5(b) of the board's rules and regulations. Even assuming it does, the effect of the board's waiver of the requirement that the plan show all municipal services remains the same. Section 3C, par. 5(b), requires only that a developer covenant to provide "improvements as shown on the Definitive Plan and as specified in Section 5." Since § 5 of the rules and regulations (entitled "Specifications for Construction of the Required Improvements") does not itself require the installation of any municipal services but only sets forth the specifications according to which the improvements depicted on the plan are to be constructed,[13] it follows that a covenant executed pursuant to § 3C, par 5(b), would, like the covenant contained in Hanian's application for approval of the plan, require the installation only of those services shown on the plan or

---

[13] As is said in § 5A, "[a]ll improvements specified or implied on the Definitive Plan shall be constructed or installed by the applicant in accordance with the provisions of this Section of the Rules and Regulations or as directed by the Board."

required by the certificate of approval (and accompanying letter) attached to the plan. It is true that in the suggested form of the covenant contained in the Appendix to the rules and regulations (Form F) the developer covenants not simply to provide municipal services "as specified in Section 5" but to provide them "in accordance with ... the applicable Rules and Regulations of said Board." However, the effect is the same. The rules, instead of requiring that particular municipal services be installed in all subdivisions, leave the question of which services are to be installed in the discretion of the board. The operative provision is subsection J, par. 1. of § 4 ("Design Standards"). That paragraph reads: "The Board will require that the plan show municipal services of the kinds existing in the public ways nearest to the subdivision, or which in the opinion of the Board are likely to be laid in such public ways within the reasonably near future and which will be necessary for the health, safety, or convenience of the prospective occupants of the subdivision." Read in context, therefore, pars. 2-10 of § 4J do no more than provide that, if the board requires pursuant to par. 1 that the plan show a particular service, the design of that service as shown on the plan must be as directed and approved by the appropriate governmental or other body.

To summarize, the board having failed in the letter accompanying its certificate of approval of the plan explicitly to require the installation of water pipes, fire hydrants, telephone lines or ducts, fire alarm cables and boxes and street lights, the consequence of its purported waiver of § 3C, par. 2(k), is that the developers' covenant does not obligate them to install any of these services. It follows that the board's purported waiver is "inconsistent with the intent and purpose of the subdivision control law" (see G. L. c. 41, § 81R) and improper. Contrast *Lyman* v. *Planning Bd. of Winchester*, 352 Mass. 209, 213-214 (1967), and *Caruso* v. *Planning Bd. of Revere*, 354 Mass. 569, 572 (1968). Among other purposes of the Sub-

division Control Law is "safety in case of fire" and "securing adequate provision for water" (G. L. c. 41, § 81M, as amended through St. 1969, c. 884, § 2) and G. L. c. 41, § 81U, as amended through St. 1972, c. 749, provides, "Before endorsement of its approval of a plan, a planning board shall require that the . . . installation of municipal services be secured by" either a bond or a covenant. See *Gordon* v. *Robinson Homes, Inc.*, 342 Mass. 529, 532 & n.1. (1961), and *Costanza & Bertolino, Inc.* v. *Planning Bd. of No. Reading*, 360 Mass. at 680. The waiver being improper, the board's approval of the plan must be annulled.

Since it appears that Hanian and Ventre will continue to seek approval of a plan to subdivide the locus, we express our opinion on the remaining issues argued by the parties which appear likely to arise upon reconsideration of the plan.

Section 3C, par. 2(g), of the board's rules and regulations requires that subdivision plans show the "[b]oundary lines, areas and dimensions of all proposed lots, with all lots designated numerically and in sequence." The twenty-one sheets of the subdivision plan depict only the fifty-one lots (together with parts of five others) shown on the drawing reproduced in Appendix A at the conclusion of the opinion. However, the developers propose to subdivide the locus not only into the lots shown on the plan but also into approximately seventy additional lots as shown on the "lot section plan"[14] which Hanian submitted to the board before its approval of the plan.

It should first be observed that the "lot section plan" is not a part of the subdivision plan approved by the board; neither the plan, the board's certificate of approval of the plan, nor the letter attached to that certificate refer to the "lot section plan." Compare *Green* v. *Board of Appeal*

---

[14] The "lot section plan" was not introduced in evidence as an exhibit, but all the parties appear to concede its existence in their briefs, and the plaintiffs have included in their brief a drawing showing the lots shown on the lot section plan.

*of Norwood,* 358 Mass. 253, 261-262 (1970); *M. DeMatteo Constr. Co.* v. *Board of Appeals of Hingham,* 3 Mass. App. Ct. 446, 458-460 (1975). Although the plaintiffs do not mention it in their brief, at least one effect of the board's failure to require that all proposed lots be depicted on the subdivision plan is that four of the lots referred to in the fourth, sixth, and eighth conditions contained in the letter attached to the board's certificate of approval of the plan (lots 292, 294, 348, and 358), although shown on the lot section plan, are either only partially depicted on the subdivision plan or not depicted at all; it follows that the fourth, sixth and eighth conditions would, at the least, be ambiguous to those relying on the information recorded at the registry of deeds. See *M. DeMatteo Constr. Co.* v. *Board of Appeals of Hingham,* 3 Mass. App. Ct. at 459-460. These deficiencies must be corrected. An obvious way to correct them is to include the lot section plan in the subdivision plan.

Apart from the deficiencies already discussed, we see no reason why the fact that the plan approved by the board fails to show all the lots into which the developers propose to subdivide the locus should of itself invalidate the board's approval of the subdivision of the locus into the lots actually shown on the plan. In light of the provision contained in G. L. c. 41, § 81O, as amended by St. 1963, c. 804, that developers can, after the approval of the plan, change the "number, shape and size" of the lots shown on subdivision plans subject to certain conditions as to frontage, the primary purpose of the requirement also contained in § 81O that the plan show the lots into which the land is to be divided must be the disclosure of "enough information . . . to enable the boards to perform their duties" (*Loring Hills Developers Trust* v. *Planning Bd. of Salem,* 374 Mass. 343, 351 [1978]) and to enable affected persons and members of the public to come to an informed judgment as to the merits of the plan, rather than to bind the developers to divide the land into exactly the lots shown on the subdivision plan. So long as the lot

section plan is before the board when it considers the
subdivision plan and is available to members of the public
before the hearing required by G. L. c. 41, § 81T, this
informational purpose of § 81O will be fulfilled even if the
developers do not include the lot section plan as part of
the subdivision plan.

Section 3C, par. 2(1), of the board's rules and regula-
tions requires that the plan show the "[l]ocation and spe-
cies of proposed street trees."[15] The subdivision plan sub-
mitted by Hanian does not show this information; we are
told that the "lot section plan," which, as has already
been seen is not a part of the subdivision plan, does show
this information. Nevertheless, given the facts that the
subdivision plan itself did not show street trees and the
certificate of approval or accompanying letter did not
contain any condition that such trees be planted, the
effect of the board's waiver of § 3C, par. 2(1), is that the
developers are under no obligation to plant street trees.[16]
See *M. DeMatteo Constr. Co.* v. *Board of Appeals of Hing-
ham*, 3 Mass. App. Ct. at 458-460, and case cited.

However, it is apparent that this result was unintend-
ed; the board clearly intended the waiver of its rules and
regulations to have only a procedural rather than a sub-
stantive effect. Inclusion of the lot section plan as part of
the subdivision plan, which we suggested earlier in this
opinion, will overcome this difficulty. Since the board
does not desire to give up its authority to review where
the developers plant street trees, we need not consider
whether it could properly do so pursuant to § 81R.

[15] The developers do not contest the board's authority to review
where the developers plant street trees. See *Daley Constr. Co.* v. *Plan-
ning Bd. of Randolph*, 340 Mass. 149 (1959).

[16] Nothing in the board's rules and regulations requires that such
trees be planted in the absence either of their being shown on the plan
or of the appearance of a condition that they be planted in the board's
certificate of approval. For the reasons stated on pages 442-443,
*supra*, § 5L does not require the planting of street trees in the circum-
stances here disclosed. See that portion of § 5A quoted in note 13,
*supra.*

Although a review of the subdivision plan reveals that it contains considerable information concerning the design and layout of the ways the developers propose to construct, the plan apparently does not contain all the information concerning those ways required by § 3C, pars. 2(f) and (n), or set it forth in the manner required by the latter provision. The parties have not, however, troubled to inform us exactly how the plan fails to comply with those provisions. Since much of the required information is obviously technical and the relevant aspects of the plan complicated, we do not feel it appropriate for us to attempt to determine on our own how the plan fails to comply. In these circumstances, we express no opinion as to whether the waiver of § 3C, pars. 2(f) and (n) was proper.

The plaintiffs contend that the board's waiver of § 3C, pars. 2(i),[17] (o),[18] and (p),[19] was improper; they argue that the failure of the topographical map submitted by Hanian before the public hearing and the failure of the plan itself to show all the information required by the waived provisions made impossible a reasoned consideration of the subdivision plan at the public hearing. This issue is unlikely, however, to arise in the same form upon further consideration of the plan. Following the public hearing Hanian submitted a more detailed map of the existing topography showing much of the information required by the waived provisions which was not shown on the earlier map. However, as the plaintiffs observe, among the re-

---

[17] This section requires that the plan show the "[l]ocation of natural waterways, swamps and water bodies within and adjacent to the subdivision."

[18] This section requires that "[a]ll natural objects and major site features, such as natural waterways, water bodies, swamps, rock ridges and outcroppings, stone walls, fences, buildings, etc. . . . be shown on a separate sheet or sheets."

[19] This section requires that "[e]xisting and proposed topography of the land at a contour interval of five . . . feet" be shown on a "separate sheet or sheets" with certain exceptions.

quirements with which neither map complies is the additional requirement of § 3C, par. 2(p), that the developer submit a map of the proposed topography of the subdivision.

In view of the fact that it is provided that this map be "not a part" of the definitive plan, and for the reasons discussed in *Loring Hills Developers Trust* v. *Planning Bd. of Salem*, 374 Mass. at 350-351, we think that the requirement of a map of the proposed topography is informational only and is not meant to bind the developer to grade the subdivision in the manner shown on that map. Given this fact, we believe that the board could properly find that a waiver of that requirement is "in the public interest and not inconsistent with the intent and purpose of the subdivision control law." See G. L. c. 41, § 81R.

The plaintiffs also assert that the map of the existing topography submitted after the public hearing is inadequate because it fails to show all the information required by § 3C, pars. 2(i), (o), and (p). However, the record contains only vague references to those natural features which that map fails to show. In these circumstances we are unable to express an opinion as to whether the board can properly waive pursuant to § 81R whatever requirements of pars. 2(i), (o), and (p), with which that map does not comply.

As to the remaining provisions of the rules and regulations that Hanian did not comply with in submitting the plan, it is sufficient to state that the plaintiffs have not sustained their burden of proving (*Selectmen of Ayer* v. *Planning Bd. of Ayer*, 3 Mass. App. Ct. 545, 548 [1975]) that the board could not properly waive those provisions in the circumstances disclosed on this record.

2. *Brookside Drive.*

As shown on the subdivision plan approved by the board, Brookside Drive meets the design criteria for minor streets[20] but not for secondary streets[21] set forth in

---

[20] Section 4B, par. 1(c), defines a minor street as a "street which, in the opinion of the Board, is being used or will be used primarily, to

§ 4B, par. 3(a). For example, it meets the requirement applicable to minor streets that the roadway be twenty-six feet wide but not the requirement applicable to secondary streets that the roadway be thirty-two feet wide. We have no doubt that Brookside Drive is a secondary street rather than a minor street as those terms are defined in § 4B, par. 1. Brookside Drive "intercept[s] several minor streets," including Lea Circle, Baker Hill Drive and Hill Top Road; it will carry traffic from those roads, on which approximately seventy lots abut, to such major streets as Fottler Road and North Street and the community facilities to which they give access, since it constitutes the shortest and most convenient route to those major streets. In these circumstances it cannot be said that Brookside Drive will be used primarily to provide access to the approximately sixty lots abutting on it.

Brookside Drive as shown on the plan thus violates the design criteria contained in § 4B, par. 3(a), and, as a result, the plan, apart from the other problems already discussed in this opinion, cannot be approved in its present form unless the board could, pursuant to G. L. c. 41, § 81R, waive the requirements of § 4B, par. 3(a). We think it best, however, that on the present record we not decide the question whether the board could properly make such a waiver. The board approved the plan on the basis that Brookside Drive was a minor street, and at trial neither the parties nor the trial judge appear to have considered the issue whether, if Brookside Drive were in fact a sec-

---

provide access to abutting lots, and which is not intended for use by through traffic."

[21] Section 4B, par. 1(b), defines a secondary street as a "street intercepting several minor streets and which in the opinion of the Board may carry traffic from such minor streets to a major street or community facility, including the principal access streets or principal circulation streets of residential subdivisions, and including all streets, except those designated as major streets, of a business or industrial subdivision."

ondary street, the design criteria applicable to such streets could be waived pursuant to § 81R.

3. *Baker Hill Drive.*

Section 4B, par. 4(a), of the rules and regulations states, "Dead-end streets shall not be longer than . . . 500 feet unless, in the opinion of the Board, a greater length is necessitated by topography or other local conditions." The plaintiffs contend that Baker Hill Drive, which is over 500 feet in length,[22] is a dead-end street within the meaning of this provision. It appears from the trial judge's findings of fact that this contention was not made below. However, since the issue may arise upon further consideration of the plan, we state our opinion that Baker Hill Drive is indeed a dead-end street within the meaning of § 4B, par. 4(a).

As shown on the plan (see Appendix A), it is closed at one end.[23] See *Sparks* v. *Planning Bd. of Westborough,* 2 Mass. App. Ct. 745, 748 (1974). Contrast *Wickham* v. *Newfane,* 190 Misc. 880, 881 (N.Y. Sup.Ct. 1947). We see no reason why the fact that the turnaround at the closed end of Baker Hill Drive is large enough to enclose fourteen house lots should affect its character as a dead-end street. Neither the board nor the developers have argued that Baker Hill Drive is, as a result of that turnaround, a combination of a number of streets, rather than a single street, and, in any event, such an argument, given the configuration of Baker Hill Drive, could not succeed. Con-

---

[22] Since that portion of Baker Hill Drive which lies between Brookside Drive and the point at which Baker Hill Drive circles back upon itself is over 500 feet in length, we need not consider whether the remainder of Baker Hill Drive (the turnaround) should be taken into account in determining the length of Baker Hill Drive for purposes of applying § 4B, par. 4(a).

[23] Webster's Third New International Dictionary (1971) defines the adjective "dead-end" as meaning "having a dead end" (at 579), and defines the noun "dead end" as "an end (as of a street . . .) that has no exit or continuation . . . cul-de-sac" (at 579); it defines "cul-de-sac" as "a street that is closed at one end but usual[ly] has a circular area for turning around at that end" (at 551).

trast *Sparks* v. *Planning Bd. of Westborough*, 2 Mass. App. Ct. at 747-749. Regulations such as § 4B, par. 4(a), are enacted because of a concern that the blocking of a dead-end street, as by a fallen tree or an automobile accident, will prevent access to the homes beyond the blockage particularly by fire engines, ambulances, and other emergency equipment; the size of the turnaround provided at the closed end of the road does nothing to mitigate that concern and may even be said to increase it (at least so long as so much of the dead-end road as is not part of the turnaround exceeds the maximum length provided for in the regulation).

The record is insufficient for us to express an opinion on the question whether the board could find pursuant to § 4B, par. 4(a), that "topography or other local conditions" require that Baker Hill Drive be longer than 500 feet.

*4. Conclusion.*

The remaining issues argued by the parties do not appear likely to arise upon further consideration of the plan. The judgment is reversed, and a new judgment is to enter annulling the board's approval of the plan.

*So ordered.*