MP CORPORATION, trustee,[1] *vs.* PLANNING BOARD
OF LEOMINSTER & others.[2]

No. 89-P-939.

Worcester. September 18, 1989. — October 5, 1989.

Present: DREBEN, CUTTER, & SMITH, JJ.

*Municipal Corporations*, City council, Planning board, Board of health,
By-laws and ordinances. *Zoning*, Amendment of by-law or ordinance.
*Health, Board of. Subdivision Control*, Access ways, Regulations, De-
cision of planning board. *Practice, Civil*, Summary judgment.

A judge of the Land Court correctly ruled that a developer's proposal for
a commercial-retail project was governed by a municipality's 1985 zon-
ing ordinance and not by a revised ordinance adopted in 1987, where
the proposal was submitted before the zoning revision was adopted.
[816-817]

A judge of the Land Court correctly ruled that a developer's proposal for
a commercial-retail project was permissible under the applicable munic-
ipal subdivision regulations governing "dead-end streets" and "looping
streets." [818-819]

No municipal board of health regulation or statutory authority was shown
to provide a basis for a planning board's consideration of a preexisting
hazardous waste problem in disapproving a definitive plan of commer-
cial-retail development submitted to the board under G. L. c. 41, §§ 81K
to 81GG. [819-820]

A judge of the Land Court properly granted summary judgment for the
plaintiff, a developer, on an appeal from a municipal planning board's
denial of approval of a definitive plan for a commercial-retail develop-
ment project, where there were no genuine issues as to material facts
and where the planning board had erred as matter of law. [820-821]

The Land Court was to retain jurisdiction in a zoning case in order to
expedite determination of any further issues that might arise in carrying
out the judgment. [821]

---

[1] Of North Central Technology Park Realty Trust.

[2] The health department of Leominster and the city of Leominster.

CIVIL ACTION commenced in the Land Court Department on April 26, 1988.

The case was heard by *Robert V. Cauchon*, J., on a motion for summary judgment.

*John J. Curley, III*, City Solicitor, for the defendants.

*Kenneth R. Berman* (*David A. Guberman* with him) for the plaintiff.

CUTTER, J. MP Corporation (MP) is trustee of a realty trust which proposes commercial-retail development of a general area of about sixty-five acres on the south side of Hamilton Street in Leominster (the city). Part of this development, to be known as Watertower Plaza (the plaza), lies within an industrial zone under the pre-1987 city zoning ordinance. It is best described by the illustration on the next page depicting a much simplified schematic plan of the development sought by MP for the plaza. This schematic plan is based on more complicated plans in the record.[3]

In 1987, when MP submitted plans under G. L. c. 41, §§ 81P, 81R, 81S, and 81U, to the Leominster planning board (the board), a citizen's petition for a complete revision of the city's zoning ordinance was being considered by the Leominster city council. The then existing 1985 zoning ordinance allowed commercial structures in an industrial zone. The proposed 1987 zoning ordinance would have excluded such commercial structures from industrial zones.

At the arguments all counsel appeared to treat as crucial the question whether the city council had adopted a new zoning ordinance before August 7, 1987. On that day MP filed (under the subdivision control law, G. L. c. 41, §§ 81K to 81GG, as

---

[3] The complete project encompasses several lots, of which only two will be within the plaza portion of the area, but substantially all (if not all) the issues in this litigation arise with respect to the plaza portion of the general area. The plaza portion contains an existing building on Hamilton Street proposed to be converted into a department store. So far as appears, no change is contemplated in the use of an existing office building on North Main Street. New construction would include a supermarket to be built west of Watertower Place, shown on the schematic plan as a two-way method of access from Hamilton Street to the large parking area lying southwest of the proposed department store.

## SCHEMATIC PLAN OF PROJECT FOR WATERTOWER PLAZA

inserted by St. 1953, c. 674, § 7) its preliminary development plan with the board. Counsel for the city stated in oral argument before us that, if the new 1987 ordinance (which prohibited a commercial use in an industrial zone) took effect *after* MP filed its preliminary plan, MP "would have the right [under the former ordinance] to go ahead with a commercial development on the locus." He contended, however, that, if the new 1987 ordinance took effect *before* MP filed with the board its preliminary plan, he would expect agreement from MP that, as matter of law, the project could not be approved by the board.

This litigation was instituted by MP in a complaint constituting both (1) an appeal from the board's decision denying approval of the development of the plaza, and (2) a request for declaratory relief declaring the rights of the parties on significant issues. It was considered at length by a Land Court judge after MP filed a motion for summary judgment in its favor.

The judge in his final decision of June 14, 1989, concluded that there were "no genuine issues of material fact" and that MP was entitled to judgment. He ruled the 1987 amendment of the preexisting city zoning ordinance was adopted by the city council on October 26, 1987, when the council passed the new ordinance to be ordained and that MP's plan was governed by the city's 1985 zoning ordinance as in effect prior to the adoption of the revised ordinance. See G. L. c. 40A, § 6; c. 41, § 81P. He ordered that the board's denial of MP's plan be annulled and that the city clerk deliver to MP a certificate that a final "decree" approving MP's plan had been entered.

The board and the city appealed from the judge's decision of June 14, 1989. A single justice of this court granted a stay of the Land Court order "pending decision of . . . [this] appeal" but also entered on the same day an order to expedite hearing of the appeal. The single justice also denied both MP's requests (a) for a "further expedition of the appeal" and (b) for a very substantial surety company bond to protect MP against significant injuries which it might be caused, even if it prevailed on this appeal, should its contractual arrangements with one or more tenants be disrupted by delay incident to the appeal.

## *Discussion*

1. We first discuss whether MP's preliminary plan was filed before or after the date when the city council adopted the changed 1987 zoning ordinance. The facts on that issue are not in dispute.

On March 9, 1987, a petition was received by the city council (no. 43 of 1987) for a complete revision of the city's 1985 zoning ordinance. The petition was referred by the city council to its legal affairs committee and to the board "for a recommendation and a hearing." Hearings were held by the city council in May, 1987.

There is some confusion in the record whether on June 8, 1987, the city council voted (in some general way) to grant the petition.[4] In any event, after June 8, 1987, there were further hearings on the petition (for example, the council minutes of October 19, 1987, refer to a discussion of further amendments of the petition).

It was not until a meeting of the city council on October 26, 1987, that (after, indeed, further amendments at that meeting) the 1987 proposed ordinance was "read a second time and passed to be ordained." The city council by these actions treated the zoning revision (on October 26) as still open to discussion and subject to amendment. The Land Court judge properly held that the 1987 amendments were not adopted until October 26, 1987. (They were signed by the mayor on October 27, 1987.)

General Laws c. 40A, § 5 (as inserted by St. 1975, c. 808, § 3), provides in its seventh paragraph, "The effective date of the adoption or amendment of any zoning ordinance . . . shall be the date on which such adoption or amendment was voted upon by a city council. . . ." The city charter in § 3.9(a) provides, "No ordinance shall be amended or repealed except by another ordinance adopted by the city council" or by referendum under the charter. No referendum was involved in this case.

---

[4] In September, 1988, a purported amendment to the minutes of the meeting of June 8, 1987, inserted the following notation: "The PETITION [no. 43 of 1987] was GRANTED as amended. VT. unan."

We conclude that the procedures called for by G. L. c. 40A, § 5, and actually used in 1987, were sufficient (under the council procedures then in effect in Leominster) to leave the earlier 1985 zoning ordinance in effect until the new ordinance was "ordained." See *Nevins* v. *City Council of Springfield*, 227 Mass. 538, 543-545 (1917). See also *Mansfield* v. *O'Brien*, 271 Mass. 515, 518-521 (1930); *Kubik* v. *Chicopee*, 353 Mass. 514, 516 (1968, passage of a zoning amendment after a veto by the mayor when a second [post-veto] "vote to adopt was the only effective such vote," cited with approval in *LaBranche* v. *A.J. Lane & Co.*, 404 Mass. 725, 731 [1989]). Compare *Durand* v. *Superintendent of Pub. Bldgs. of Fall River*, 354 Mass. 74, 75 (1968); *Trumper* v. *Quincy*, 358 Mass. 311, 312 (1970), where the city council voted only once on a proposed zoning change, but the vote was ineffective because of failure to comply with § 7 of the former Zoning Enabling Act which was superseded by St. 1975, c. 808. In view of our decision, MP's definitive plan is to be evaluated on the basis of the 1985 city zoning ordinance (still operative on August 7, 1987). See G. L. 40A, § 6, fifth par., as amended by St. 1982, c. 185.[5]

2. Despite the city's and the board's concessions at the arguments, they contend in their brief that in various respects MP's plans were in conflict with the city's 1972 subdivision

---

[5] The pertinent portion of the fifth paragraph of c. 40A, § 6, read as follows on August 7, 1987:

"If a definitive plan, or a preliminary plan followed within seven months by a definitive plan, is submitted to a planning board for approval under the subdivision control law, and written notice of such submission has been given to the city . . . clerk before the effective date of [the] ordinance . . ., the land shown on such plan shall be governed by the applicable provisions of the zoning ordinance . . . in effect at the time of the first such submission while such plan or plans are being processed under the subdivision control law, and, if such definitive plan or an amendment thereof is finally approved, for eight years from the date of the endorsement of such approval . . . [with an exception here not relevant]."

As the record shows that the definitive plan was filed by MP on January 19, 1988, and all appropriate notices were given to the city clerk, there was complete compliance with the quoted provision of c. 40A, § 6.

regulations. We consider in the following paragraphs the principal contentions thus made.[6]

3. The city and board first contend that the board's subdivision regulations preclude board approval of Watertower Place as a part of MP's definitive plan for Watertower Plaza.

We interpret the board's 1972 regulations as requiring MP (even for a commercial-retail development) to comply (in an industrial zone) with the regulations applicable to such a zone under the 1985 zoning ordinance (see part one of this opinion). It does not seem to be disputed that the 1985 zoning ordinance permitted commercial and retail uses in an industrial zone.[7] There is, however, some ambiguity in pertinent subdivision regulations because of the language of §§ 4.0.0.5 and 4.0.0.6 of the regulations (dealing with "dead-end streets") when read with § 4.14.4 with respect to "looping streets." The aggregate of these provisions[8] seems to us to be an effort by regulations to permit the general type of "turnaround" authorized by G. L. c. 41, § 81Q. So viewed, the regulations make it unnecessary to determine whether Watertower Place is a "dead-end street," a matter on which the Massachusetts cases are not completely consistent. See, e.g., *Sparks* v. *Planning Bd. of Westborough,*

---

[6] Some of these contentions are dealt with in the affidavit of Thomas J. McCarthy, clerk and treasurer of MP, given prior to the Land Court judge's final decision granting summary judgment. This affidavit and others were not answered by any counter-affidavits on behalf of the city and the board.

[7] See § 22-26 of the 1985 zoning ordinance.

[8] The subdivision regulations just mentioned (emphasis supplied) read:
"4.0.0.5 *Dead-end streets* shall not be longer than 500 feet unless, in the opinion of the [b]oard, a greater length is necessitated by topography or other local conditions.
"4.0.0.6 *Dead-end streets* shall be provided *at the closed end* with a *turnaround* having an outside roadway diameter of at least 100 feet and a property line diameter of at least 120 feet. . . .
"4.14.0 *Industrial subdivisions* shall comply with all requirements of the Subdivision Regulations except as noted in this section. . . .
"4.14.4 *Looping streets* and second exits should be provided to avoid cul-de-sac type turnaround."
These provisions are authorized by G. L. c. 41, § 81Q (as inserted by St. 1959, c. 410), which reads, in part, that subdivision "rules and regulations may set forth a requirement that a turnaround be provided at the end of the approved portion of *a way which does not connect with another way*" (emphasis supplied).

2 Mass. App. Ct. 745, 748 (1974), which referred to *LaCroix* v. *Commonwealth*, 348 Mass. 652, 653-654 (1965). See also *Wheatley* v. *Planning Bd. of Hingham*, 7 Mass. App. Ct. 435, 450, 452 (1979).[9]

The Land Court judge found that the turnaround easement "act[s] in effect as a looping street serving a shopping center parking lot." So considered, it seems adequately to deal with the city's and the board's contention that Watertower Place "does not lose its character as a dead-end street merely because it may be physically possible to travel beyond its [southern] terminus." On the facts shown by this record, a driver entering Watertower Place from Hamilton Street would have two options. The driver could (a) go back through Watertower Place to Hamilton Street or (b) cross the parking lot to the west and depart through the existing curb cut to North Main Street. The Land Court judge correctly ruled in effect that each course was permissible under the existing subdivision regulations.

4. The city and the board dispute in some degree whether MP's definitive plan presents any unresolved health questions. G. L. c. 41, § 81U, as amended by St. 1978, c. 422, § 1, provides in part: "When a definitive plan of a subdivision is submitted to the planning board, as provided in section eighty-one O, a copy thereof shall also be filed with the board of health. . . . Such health board . . . shall, within forty-five days after the plan is so filed, report to the planning board in writing, approval or disapproval of said plan. . . . Failure of such board . . . to report shall be deemed approval by such board. . . ." MP filed their definitive plan with the board of health. The board of health did not hold any hearing, or respond to the planning board, concerning MP's definitive plan within the forty-five day statutory period.

Because of this nonaction, the board of health is deemed to have approved the definitive plan. G. L. c. 41, § 81U. "A planning board has no discretion to disapprove a subdivision

---

[9] This decision was one where the court did not have before it a subdivision regulation expressly dealing with (and apparently permitting) a "looping street." Compare § 4.14.4, note 8, *supra*.

plan which has been approved by the board of health and is in conformance with the reasonable rules and regulations of the planning board." *Patelle* v. *Planning Bd. of Woburn*, 6 Mass. App. Ct. 951 (1978). See also *Baker* v. *Planning Bd. of Framingham*, 353 Mass. 141, 144 (1967); G. L. c. 41, § 81M.

The board of health after the expiration of the forty-five day period mentioned in c. 41, § 81U, on March 22, 1988, did write to the planning board enclosing a copy of a letter to MP dated March 10, 1988, from the State Department of Environmental Quality Engineering (DEQE) calling to MP's attention its possible liability under G. L. c. 21E (the hazardous material act). The Leominster board of health recommended that the plaza subdivision be disapproved until the receipt of DEQE's orders. No board regulations have been called to our attention which require absence of hazardous waste or expressly deal with the subject of hazardous waste.

It appears that any hazardous waste problem was a preexisting one and is not directly related to MP's proposed development. We perceive in the statutes already cited no basis for concluding that a planning board has authority to disapprove a definitive plan because of an already existing hazardous waste problem. See the discussion in *Daley Constr. Co.* v. *Planning Bd. of Randolph*, 340 Mass. 149, 153 (1959), reviewing the legislative history of the subdivision control law. See also *Pieper* v. *Planning Bd. of Southborough*, 340 Mass. 157, 163-164 (1959).

On the authority of the cases just cited, the matter of hazardous waste would not be proper for consideration for the planning board under G. L. c. 41, § 81M. Instead, on this record, it appears to be the responsibility of DEQE under G. L. c. 21E.

5. The board's letter of April 8, 1988, denying approval of MP's definitive plan, made only general and inconclusive suggestions for amendment of the plan on grounds of traffic concerns. Essentially, the board's letter merely criticizes in imprecise terms the traffic impact analysis submitted to the board by MP. There were no definite suggestions for amendment of the plan as in *Mac-Rich Realty Constr., Inc.* v. *Planning Bd.*

*of Southborough*, 4 Mass. App. Ct. 79, 86 (1976). See and compare *North Landers Corp.* v. *Planning Bd. of Falmouth*, 382 Mass. 432, 444-446 (1981). In no way does the letter denying approval point to particular board regulations which the board contends MP's plan to have violated. See *Canter* v. *Planning Bd. of Westborough*, 4 Mass. App. Ct. 306, 307-310 (1976). As already stated, no counter-affidavits (on the motion for summary judgment) were filed by the city or the board to show violation of regulations by MP.

6. We regard this case as coming within the principles (permitting summary judgment) set out in the careful opinion of Mr. Justice Quirico in *Framingham Clinic, Inc.* v. *Zoning Bd. of Appeals of Framingham*, 382 Mass. 283, 298-299 (1981). That case recognizes that important limitations on the powers of planning boards exist. Compare the limitations upon the flexibility of zoning provisions discussed in *SCIT, Inc.* v. *Planning Bd. of Braintree*, 19 Mass. App. Ct. 101, 106-111 (1984).

We, on the present record and contentions, "perceive no legitimate purpose to be served by further trial proceedings," see the *Framingham Clinic* case at 299, and affirm the judgment of the Land Court, except that, as was provided in the trial judge's order in the *Framingham* case, a paragraph shall be added to the Land Court's order and judgment, reading: "5. In view of the significant errors of law committed by the Board which have caused delay to the plaintiff (with the consequent serious risk of loss by the plaintiff [MP] of tenants contemplated by the definitive plan), the Land Court reserves jurisdiction in the matter so that it may expedite determination of any further issues which may arise in carrying out this order and judgment."[10]

The judgment is affirmed as modified in accordance with this opinion.

*So ordered.*

---

[10] The McCarthy affidavit (see note 6, *supra*) shows that the board was told that a modification of the turnaround easement, if preferred by the board, would be acceptable to MP. Working out the details of such a modification is one example of an advantage to be found in a reservation of jurisdiction by the Land Court.