OLIVA vs. BAIRD, MISC 18-000613

































 
 ANTHONY B. OLIVA, as Trustee of Highland Street Realty Trust, Plaintiff v. MICHAEL BAIRD, FRED MONACO, MICHAEL BIVIANO, NIK PAPPASTRATIS, and KATIE O'DONNELL, as they comprise the TOWN OF MARSHFIELD PLANNING BOARD, Defendants
 MISC 18-000613 
 JULY 2, 2021
PLYMOUTH, ss.
Speicher, J.
DECISION














 The plaintiff, Anthony B. Oliva, owner of a 17.768-acre parcel located off of Highland Street in Marshfield, appeals the decision of the defendants, members of the Planning Board of the Town of Marshfield ("Planning Board" or "Board") dated October 30, 2018, in which the Board denied a special permit for an open space residential development ("OSRD"), and approved a definitive subdivision application, but denied three requested waivers for an eight-lot cluster residential subdivision project known as "Christmas Cove." 





 This case was originally scheduled for trial in June, 2020, but was rescheduled due to the COVID-19 pandemic. Pursuant to orders issued by the Supreme Judicial Court and the Land Court providing procedures for the conduct of cases during the pandemic, the case was rescheduled for trial by videoconference. The case was tried before me, by videoconference, on December 15 and 16, 2020. Witnesses at trial were Jeffrey Couture and Jack O'Leary, engineer and project manager with the company Sitec, who testified on behalf of the plaintiff, Oliva. Patrick Brennan, Marshfield's engineer and project reviewer, and Gregory Guimond, the Town Planner, testified on behalf of the Planning Board. Thirty-five exhibits were introduced into evidence. Following the submission of post-trial briefs and proposed findings of fact, I took the case under advisement on March 8, 2021. 





 Where, as here, the Board has denied certain requested waivers for a definitive subdivision and has denied a special permit for the proposed Christmas Cove project for reasons that do not address, in any credible fashion, the safety or functionality of the project as required by the Subdivision Control Law or the Planning Board's Subdivision Rules and Regulations, and where the Board has denied the requested special permit for reasons that are legally untenable and which are otherwise unreasonable and arbitrary and capricious, the Board's decision must be annulled with directions to the Board to grant the requested waivers and the special permit for the reasons stated below. 





FACTS 





 Based on the facts stipulated by the parties, the documentary and testimonial evidence admitted at trial and my assessment as the trier of fact of the credibility, weight, and inferences reasonably to be drawn from the evidence admitted at trial, I make the following factual findings: [Note 1] 





The Property and the Parties 





1. Anthony B. Oliva, Trustee of the Highland Street Realty Trust, ("Oliva") owns an undeveloped parcel of land off of Highland Street in Marshfield (the "Property") pursuant to a deed dated June 21, 2002, and recorded with the Plymouth County Registry of Deeds (the "Registry") in Book 22295 at Pages 84-85. [Note 2]





2. The Property is approximately 17.89 acres in size and has 106.01 feet of frontage on Highland Street. [Note 3] The frontage of the parcel leads to a narrow neck that extends for about the first five hundred feet into the Property before the parcel opens up to a much wider area. Entering the wider, back portion of the Property, much of the area to the north is encumbered by bordering vegetated wetlands and by an isolated wetland. [Note 4] 





3. The high point of the Property is near the southeast corner close to Highland Street. Moving away (east) from Highland Street, the parcel slopes steeply downward toward the back right (northeast) corner of the Property. Abutting properties are improved by single family homes with their frontage on Highland Street. 





4. The Property is in the R-1 zoning district in which 43,560 square feet of area and 125 feet of frontage are required for a building lot for a single-family residence. [Note 5]





5. The Planning Board is the special permit granting authority for the OSRD special permit and the approval authority for the definitive subdivision approval sought by the applicant, Oliva. 





The Zoning Bylaw and Subdivision Rules and Regulations 





6. Pursuant to its authority under the Marshfield Subdivision Rules and Regulations, the Planning Board makes determinations regarding approval of proposed subdivisions with "due regard for the provision of adequate access to all of the lots in a subdivision by ways that will be safe and convenient for travel; for lessening congestion in such ways and in the adjacent public ways; for reducing danger to life and limb in the operation of motor vehicles; for securing safety in case of fire, flood, panic or other emergencies; for ensuring compliance with the applicable zoning ordinances or bylaws; for securing adequate provision for water, sewage, drainage, and other requirements where necessary, in a subdivision; and for coordinating the ways in a subdivision with each other and with the public ways in the Town and with the ways in neighboring subdivisions." [Note 6] 





7. Section 11.04 of the Marshfield Zoning Bylaw (the "Bylaw") provides for approval by special permit of Open Space Residential Developments ("OSRD"). An OSRD is a subdivision of land in which, upon approval of a special permit, the minimum lot size otherwise required may be reduced to 15,000 square feet and the minimum frontage for a building lot may be reduced to 75 feet. The excess land that otherwise would have been required for lot area for each building lot is then preserved as open space on a separate lot in the subdivision. The Bylaw provides that an OSRD is the "preferred" type of development for subdivisions of five or more lots. [Note 7] 





8. Pursuant to Section 11.04.4 of the Bylaw, the Planning Board has adopted rules and regulations for OSRD projects ("OSRD Rules and Regulations" or "OSRD Rules"). [Note 8] The OSRD Rules and Regulations address the size, content, and number of copies of preliminary and definitive subdivision plans and other submittals and the procedure for review of OSRD special permits. 





9. An applicant for an OSRD must apply simultaneously for an OSRD special permit under Section 11.04 of the Bylaw, and for approval of a definitive subdivision plan pursuant to the Subdivision Control Law, G. L. c. 41, § 81k, et seq. and the Marshfield Planning Board Subdivision Rules and Regulations. [Note 9]





10. In conjunction with this dual application, an applicant must demonstrate that the number of lots sought to be approved would also be approvable with full-sized lots in a conventional subdivision plan. [Note 10] In other words, if one is seeking approval of an eight-lot OSRD, with 15,000 square foot lots with 75 feet of frontage each, then one must demonstrate that the same number of lots could be approved in a conventional subdivision plan with full-sized lots; in the case of the Property, lots with 43,560 square feet in area with 125 feet of frontage as otherwise required for the R-1 zoning district. [Note 11]





Oliva's Application and the Board's Decision 





11. On November 6, 2017, Oliva applied for approval of an OSRD referred to on the application as "Christmas Cove," to include eight lots with just over the minimum lot area of 15,000 square feet per lot, and with the required 75 feet of frontage for OSRD lots. The plan proposed a total open space area of approximately 12.57 acres, consisting of a 10.65-acre habitat management area and a 2-acre, non-buildable "drainage" lot to be preserved as open space. [Note 12] In order to demonstrate access to the building lots, Oliva submitted a subdivision plan featuring a dead-end subdivision roadway with a cul-de-sac turnaround, with a total linear length of about 1,030 feet. [Note 13]





12. Bylaw Section 11.04 provides that the number of lots allowed in an OSRD subdivision is determined by applying the following formula: Area of the property times 0.9, divided by the conventional minimum lot area for the zoning district (in this case, the subject property is zoned R-1, requiring 43,650 square feet per lot). [Note 14] 





13. The allowable lot density for the Christmas Cove OSRD is determined by applying the formula in Section 11.04 as follows: [Note 15] 





 Applicable land area: 17.768 acres x 0.9 = 15.991 





 Maximum density allowed: 15.991 / 43,560 feet = 15 lots 





 Proposed density of the Christmas Cove OSRD= 8 lots 





14. In addition, in order to demonstrate the number of lots that could be approved in a conventional subdivision on the Property, Oliva submitted a plan, referred to by the parties as the "yield plan," although there is no such term used in Section 11.04 of the Bylaw regulating OSRD subdivisions, the Subdivision Rules and Regulations, or the OSRD Rules and Regulations. [Note 16] 





15. The yield plan submitted by Oliva showed eight lots with a minimum of 43,560 square feet of area and a minimum of 125 feet of frontage per lot, and with the minimum diameter required for placement of dwellings on each lot. The yield plan utilized a dead end roadway for access from Highland Street leading to a loop road, with a total linear length of subdivision roadway including the loop section of the road of approximately 1,800 feet. [Note 17] 





16. The Subdivision Rules and Regulations provide for a maximum length of dead-end roadway of 600 feet, "unless, in the opinion of the Planning Board, a greater length is necessitated by the topography or other local conditions." [Note 18] The rules also call for dead end roadways to terminate in a turnaround: "[d]ead-end streets shall be provided at the closed end with a turnaround having an outside roadway diameter of at least 120 feet in diameter with a property line diameter of at least 140 feet, the configuration of which is to conform to the typical cul-de-sac detail drawing." [Note 19] The typical cul-de-sac detail drawing referred to as the "Typical Detail" is included as an attachment ("Appendix B") to the Subdivision Rules and Regulations. [Note 20] 





17. The Subdivision Rules and Regulations also provide for the issuance of waivers: "[t]he Board may, when appropriate, waive such portions of these rules and regulations when, in its judgment, such action is in the public interest and not inconsistent with the purpose of the Subdivision Control Law." [Note 21] 





18. As permitted under the Subdivision Control Law and under the Board's Subdivision Rules and Regulations, Oliva requested seven waivers in conjunction with its OSRD special permit application. The following three waivers are the subject of the present dispute: [Note 22] 





 a. Waiver to allow a dead-end street longer than 600 feet (Subdivision Rules and Regulations section 4.1.5.a (405-9.E (1)); [Note 23] 





 b. Waiver to allow modified cul-de-sac geometry (Subdivision Rules and Regulations § 4.1.5.b (405-9.E (2)); [Note 24] and 





 c. Waiver to allow storm water discharge 40 feet from the property line versus the 50-foot minimum distance prescribed by Subdivision Rules and Regulations § 4.2.2 c.i (405-10.B (4)). [Note 25] 





19. The Board opened the public hearing for the Christmas Cove OSRD special permit and definitive subdivision application on December 11, 2017, and conducted continued hearings on March 26, 2018, May 7, 2018, and August 13, 2018. [Note 26] On October 30, 2018, the five-member Board issued a written decision, filed with the Town Clerk on the same date, in which the Board denied the special permit by a vote of three in favor, two opposed, thus falling short of the supermajority required by G.L. c. 40A, § 9, and approved the definitive subdivision plan by a majority vote of three in favor and two opposed to the approval, but denied three subdivision waivers: for length of single access roadway, cul-de-sac geometry, and storm water discharge location (hereinafter referred to as the "Decision"). [Note 27] 





20. The Board, in denying the special permit for the Christmas Cove OSRD subdivision, made six findings based on Bylaw Section 11.04.4 (a), Procedural Requirements, Criteria for Special Permit Decisions for OSRD applications, fully recounted in the discussion below. [Note 28]





21. The Board also considered and made determinations, one way or another, on seven requests for waivers of the Subdivision Rules. Of these requests, three waivers were denied as follows: [Note 29] 





 a. Waiver I. The Planning Board voted 2 to 2 with 1 abstention to grant a waiver allowing a dead-end street longer than 600 feet (Subdivision Rules and Regulations section 4.1.5.a). The Planning Board found such a waiver was in the public interest due to the amount of open space (12.05 acres) provided and the protection of the NHESP Rare and Endangered Habitat. This motion failed to get a simple majority; therefore the waiver was not granted. 





 b. Waiver 2. The Planning Board voted 2 to 3 to grant a waiver to allow a modified cul-de-sac geometry. This motion failed to get a simple majority; therefore the waiver was not granted. 





 c. Waiver 4. The Planning Board voted 5 to 0 to deny a waiver to allow storm-water discharge closer than 50 feet to a property line (plan shows a sub-drain discharge off of the cul-de-sac to a point 40 feet from the property line). The Planning Board could not find such a waiver was in the public interest. [Note 30]





22. The Board stated in its Decision that, at least two [Board] members had concerns with the design of the yield plan being in strict compliance with the OSRD By-law and the Subdivision Rules and Regulations. The two board members felt [that] a yield plan showing four lots around a standard cul-de-sac would have been in strict compliance without waivers." [Note 31] The Board further noted in its decision that "by allowing eight lots which were not in strict compliance by the Zoning and Subdivision Rules and Regulations could be viewed as a density bonus and arbitrary which could undermine the public's trust in the Planning Board." In addition, the Decision referenced a concern with the "failure to finalize (after 9 months) the conservation restriction language and to establish a stewardship endowment in order to show the permanent protection of the open space and habitat management areas." [Note 32] 





23. The Board's Decision also states, "[t]he application, notice of the public hearing, exhibits, minutes of the hearing and all written submissions received in the course of the proceedings are contained in the Planning Boards' official file for the Special Permit and are hereby incorporated into the record by this reference." [Note 33]





Prior Subdivision Projects 





24. In November, 2006, the Planning Board approved an OSRD subdivision named "Pine Oak Farm" that included 19 lots on approximately 28 acres. In its decision approving the project, the Board voted to grant six waivers requested by the applicant, which included, in part: 1) a waiver from Section 4.1.5.a of the Subdivision Rules to allow a dead-end roadway of 1,330 linear feet in lieu of the 600-foot maximum length for dead-end streets, and 2) a waiver to allow 19 dwellings to be served by a single access roadway for the proposed subdivision (with the inclusion of an emergency access route) in lieu of the eight-dwelling maximum to be served by a single-access roadway. [Note 34] 





25. In January, 2011, the Board approved an OSRD subdivision, referred to as "Cranberry Cove" which included 13 lots on a 23.3-acre site. In its decision approving the Cranberry Cove OSRD, the Board granted seven requested waivers, including, in part: 1) a waiver for the proposed dead-end street of 1,360 linear feet in lieu of the 600-foot maximum length for dead-end streets set forth in Section 4.1.5.a of the Subdivision Rules; and 2) a waiver to allow 13 dwellings to be served by a single access roadway in lieu of the eight dwelling maximum that may be served by a single point of access, as prescribed in Section 4.1.4.a of the Subdivision Rules. [Note 35] 





26. In October, 2014, the Board approved a definitive subdivision plan with 15 lots on a site of approximately 39 acres, referred to as the "Adelaide Way" subdivision. In its decision approving Adelaide Way, the Board granted 18 requested waivers, including waivers to allow: 1) a proposed 1,320-foot dead-end street in lieu of the 600-foot maximum single access roadway length set forth in Section 4.1.5.a of the Subdivision Rules; and 2) 15 dwellings served by a single access point (with an emergency access route) in lieu of the eight-dwelling maximum proscribed in Section 4.1.4.a of the Subdivision Rules. [Note 36] The Board also granted a waiver to allow the modification of a roadway cross-section (sidewalk location) in lieu of the details and dimensional requirements shown in Appendix A, Typical Road Cross Sections, of the Subdivision Rules (Section 4.1.4.f). [Note 37] 





DISCUSSION 





 An OSRD is a type of subdivision in Marshfield that clusters homes on relatively small lots, allowing reductions in lot area and frontage in return for the preservation of open space, and providing the Board with greater control over the planning process than a traditional definitive subdivision. Because of the variations from standard zoning dimensional requirements, an applicant seeking an OSRD in Marshfield must apply for a special permit in addition to seeking approval of a definitive subdivision plan pursuant to G. L. c. 41, § 81T. Therefore, a denial of an OSRD must be reviewed as an appeal pursuant to G. L. c. 41, § 81BB, of the Subdivision Control Law, which governs review of subdivision plans, and must also be reviewed as an appeal under G. L. c. 40A S 17, which governs the review of special permits. The Planning Board's Decision is considered separately under each of these statutes, below.





I. THE DENIAL OF WAIVERS WAS ARBITRARY AND CAPRICIOUS AND AN ABUSE OF DISCRETION. 





 Although technically the Planning Board approved the definitive subdivision plan and denied only the request for waivers of three of its rules and regulations, the denial of the requested waiver for the maximum length of a dead-end road turned the decision into an effective denial, as it made the proposed eight-lot subdivision infeasible without the grant of the waiver. This is to be contrasted with other waivers commonly sought by developers, such as waivers for the construction of a sidewalk on both sides of the road, or waivers requiring granite curbing, where the effect of the denial is not to make the subdivision infeasible, but rather to simply require additional construction costs. 





 In reviewing appeals brought pursuant to G. L. c. 41, § 81BB, the court finds the facts de novo and determines whether, on the facts found by the trial judge, the plan conforms to the reasonable rules and regulations of the planning board. Rettig v. Planning Bd. of Rowley, 332 Mass. 476 , 478, (1955). "[T]he developer has the burden of proving that the planning board has exceeded its authority in disapproving the plan." Fairbairn v. Planning Bd. of Barnstable, 5 Mass. App. Ct. 171 , 173 (1977), citing Mac-Rich Realty Constr., Inc. v. Planning Bd. of Southborough, 4 Mass. App. Ct. 79 ,83 (1976). While a trial judge may not substitute his or her own judgment for that of the planning board, see Strand v. Planning Bd. of Sudbury, 5 Mass. App. Ct. 18 , 21 (1977), the Board's decision will not be sustained where it has acted outside of its authority under the subdivision control law. Johnson v. Foreman, 12 LCR 494 , 496 (2004) (Piper, J.). For a denial to be upheld, the planning board must "state in detail wherein the plan does not conform to the rules and regulations of the planning board or the recommendations of the health board or officer[.]" G. L. c. 41, § 81U; see also 0.I.B., Corp. v. Planning Bd. of Braintree, 6 LCR 57 , 62 (1998) (Scheier, J.) ("A planning board may not exercise its authority to disapprove a plan on the vague grounds that the best interest of the town or the public interest would be served by its disapproval."). A court's review of such a denial "must be confined to the reasons for disapproval of the subdivision plan stated by the planning board." Canter v. Planning Bd. of Westborough, 4 Mass. App. Ct. 306 , 307 (1976). 





 In general, a planning board has broad discretion to waive the requirements of its subdivision rules and regulations, where such a waiver is "in the public interest and not inconsistent with the intent and purpose of the subdivision control law." Mac-Rich Realty Constr., Inc. v. Planning Bd. of Southborough, supra, 4 Mass. App. Ct. at 85, citing G. L. c. 41, §81R. "A planning board's decision to grant or deny a waiver will be upheld unless premised upon 'a legally untenable ground, or is unreasonable, whimsical, capricious or arbitrary." Krafchuk v. Planning Bd. of Ipswich, 453 Mass. 517 , 529 (2009), quoting Musto v. Planning Bd. of Medfield, 54 Mass. App. Ct. 831 , 837 (2002). 





 However, the denial of waivers can be deemed improper in certain circumstances if the denial is an abuse of discretion. Such circumstances might appear where a board applies its rules and regulations differently to similarly situated applicants, or if it acts in bad faith or based on an improper motive. Lakeside Builders, Inc. v. Planning Bd. of Franklin, 8 LCR 249 , 254 (2000) (Green, J.); see also Musto v. Medfield Planning Bd., supra, 54 Mass. App. Ct. at 838 (2002) (denial of subdivision waivers was abuse of discretion where public safety issues not implicated and planning board was motivated by desire to limit number of buildable lots); and compare Riverside Contracting, Inc. v. Defeo, 7 LCR 155 (1999) (Green. J.) (refusal to grant waiver from 500-foot limit on dead-end streets not an abuse of discretion without demonstration that the characteristics of other plans with approved waivers were similar). 





 On appeal from a decision of a planning board pursuant to the provisions of G.L. c. 41 § 81BB, the court must determine whether the plan is in accordance with the applicable subdivision rules and regulations and whether the decision of the planning board is arbitrary, unreasonable and capricious and not in accordance with law. If the standards are met, then the court must find for the board. The Planning Board's denial of each of the three remaining contested waivers is considered below. 





 A. The Board's Denial of the Waiver for Roadway Length Was Arbitrary and Capricious. 





 The Board's decision to deny the waiver for roadway length was arbitrary and capricious because the Board failed to appropriately and consistently apply its own rules and regulations applicable to the length of subdivision roadways. The Board argues that, since the proposed dead-end road length did not conform to the Subdivision Rules and Regulations, the Board was not obliged to waive strict compliance with the roadway length rule, and therefore it acted properly in disapproving the waiver request. 





 Roadway lengths applicable to subdivisions are restricted by the Subdivision Rules and Regulations, Section 405-9, which states in relevant part: "[d]ead-end streets shall not be longer than 600 feet unless, in the opinion of the Planning Board, a greater length is necessitated by the topography or other local conditions." [Note 38] Importantly, the Subdivision Rules and Regulations define "dead end [street]" as an area of single access:" 





 Area of Single Access: A permanent or temporary dead-end street or series of dead-end streets intersecting with each other in such a way as to provide sole access to and from an existing street for not more than eight dwellings total. This category is meant to include but not be limited to cul-de-sac, loop, hammerhead turnaround, and other dead-end street types. 





Exhibit 25, Section 405-4, Definitions (PDF pages 4-5) (emphasis added). Waivers are governed by Section 405-22 of the Subdivision Rules and Regulations, which provides: "[t]he Board may, when appropriate, waive such portions of these rules and regulations when, in its judgment, such action is in the public interest and not inconsistent with the purpose of the Subdivision Control Law." [Note 39] 





 In the Decision, the Board stated the following reason for the denial of the roadway length waiver: 





 The Planning Board voted 2 to 2 with 1 abstention to grant a waiver allowing a dead-end street longer than 600 feet (Subdivision Rules and Regulations section 4.1.5(a). The Planning Board found such waiver was in the public interest due to the amount of open space (12.05 acres) provided and the protection of the NHESP Rare and Endangered Species Habitat. This motion failed to get a simple majority; therefore the waiver was not granted. 





Exhibit 22, Decision (PDF page 3). Here, the Board's stated reason for denial of the waiver was in conflict with its conclusion, but was stated in this fashion because, as it did with the special permit findings, the Board stated a positive finding, then simply stated that the positive finding did not garner a sufficient vote for passage of the waiver. Such an amorphous reason, simply the absence of a positive finding, is insufficient to support the Board's denial in the face of uncontradicted evidence at trial that the public safety purpose of the restriction on road length was fully addressed by the proposed subdivision plan. 





 The Board's stated reason for denial of the waiver request bore no relationship to public safety. The traditional reason given for such a regulation is the concern that a disabled car or a fallen tree, for example, might block the passage of public safety vehicles such as ambulances, police cars or fire engines. See Wheatley v. Planning Board of Hingham, 7 Mass. App. Ct. 435 , 450-451 (1979). While the Decision is devoid of any justification for the denial of the roadway length waiver, at trial, the Board argued that dead-end streets, absent secondary access routes, potentially pose public safety and functionality concerns. Along the same lines, the Board argued that the potential safety concerns associated with dead-end roads longer than 600 feet would be properly addressed by an emergency access route, and consequently, that dead-end street waivers are appropriate when there is a second (emergency) access route to supplement the primary access to a public way. "With a secondary means of access, you provide that access in the event of an emergency if the main road was blocked." [Note 40] This argument falls short for several reasons. First, prior iterations of the Christmas Cove preliminary plans did include an emergency access route, and those plans were reviewed by the Board's engineer and peer reviewer, Patrick Brennan. [Note 41] That secondary access route was removed in subsequent versions of the project plans, including the final proposed plans; changes which were not identified by Brennan or the Board in its review of the final application as potentially problematic due to public safety concerns resulting from the single access road. 





 However, to the extent a secondary access road is necessary for public safety - to ensure that if a road that is longer than 600 feet is obstructed in an emergency, there is an alternative route - that concern is explicitly addressed in the Subdivision Rules and Regulations, which requires secondary or emergency access for subdivisions with more than eight dwellings. [Note 42] The limitation set forth in the description of "area of single access" defines the performance standard for dead-end streets; that single access roadways may serve a maximum of eight units to ensure public safety. At trial, the Board confirmed this standard: "the rules and regulations limit the number of lots that can be serviced by a dead-end road to eight. So anything over that, you know, in order to grant the waiver, they would have to provide a secondary means of access." [Note 43] The Planning Board thus acknowledged that its regulations impose at least a rebuttable presumptionwhich it has failed to even attempt to rebutthat a dead-end road with up to eight lots is safe, without the addition of a secondary emergency access road. Here, the proposed project meets the Marshfield standards for safety without a secondary road because the subdivision plan is limited to eight dwellings on eight lots. [Note 44] Accordingly, and per the Board's own admission, a waiver for length of a single access roadway to a development with eight dwelling units or fewer does not require a secondary access in order to maintain public safety. 





 B. The Board's Denial of the Roadway Length Waiver Was also Pretextual or Otherwise Arbitrary. 





 Oliva also asserts that the Board has a history of approving dead-end street waivers that is inconsistent with its denial of an identical waiver request for the Christmas Cove OSRD project, and for subdivisions with more than eight lots. Oliva identifies three prior subdivision projects as evidence of the Board's inconsistent application of the performance standard set forth in the Subdivision Rules and Regulations. In 2006, the Board approved and granted a special permit for the Pine Oak Farm OSRD subdivision that included 19 dwellings on approximately 28 acres. [Note 45] In its decision, the Board stated that the roadway length waiver to allow a 1,330 dead-end street was warranted due to the existence of a secondary access route for emergencies. [Note 46] In 2014, the Board granted a roadway length waiver for a 15-lot definitive subdivision, Adelaide Way, which included a single-access road of approximately 1,320 linear feet. [Note 47] At trial, the Board asserted that for both Pine Oak Farm and Adelaide Way, waivers were 

granted due to the existence of a secondary, emergency access route to a public way. [Note 48] However, Pine Oak Farm and Adelaide Way, which created 19 lots and 15 lots respectively, both expressly fell within the prohibition of Section 405-9 of the Subdivision Rules which appears to prohibit dead-end roadways not only of more than 600 feet, but those with more than eight lots along them. [Note 49] Finally, Oliva cited the Cranberry Cove OSRD project, a 13-lot subdivision with a 1,360-foot single access route that was approved with a roadway length waiver despite the absence of an emergency access road. [Note 50] At trial, the Board offered no viable explanation for the inconsistency between the approval of the Cranberry Cove OSRD subdivision project and corresponding roadway length waiver and the subject project, Christmas Cove, citing only that the former was approved in 2011 by a Board that now consists of different members. Pointing to the changing membership of the Board, without offering any substantive justification 

for the discrepancy between the two different results, only highlights the arbitrary nature of these irreconcilable decisions with respect to roadway length waiver requests. 





 In addition, the uncontradicted evidence at trial showed that "a greater length (than 600 feet] is necessitated by the topography or other local conditions," such that it was an abuse of discretion for the Planning Board not to grant a waiver on this ground, as provided in Rule 405 9.E. Specifically, wetlands along the northern perimeter of the property, and existing homes on the southern line adjacent to Highland Street, create a narrow, bounded access route from Highland Street, much like a bottleneck, that opens up around 700 feet north (inward) along the single access road. "The access is too narrow and it's impacted by wetlands, so there's no practical way to create a lot until you're well past the narrow point of the land... there's little ability to create frontage - there's no ability to create frontage from eight lots from that point without doing an open space residential development or a subdivision for turnaround." [Note 51] Along the same lines, the testimony by the Board's expert, Patrick Brennan, was consistent with the applicant's characterization of the site: "part of the problem with the site is the site is a back lot, so it takes a lot of linear feet to get to the back portion of the lot." [Note 52] The evidence was undisputed that, notwithstanding the ample acreage of the site, the topography of the site severely restricts development but for the roadway length waiver. The narrow, undevelopable neck leading from Highland Street to the developable part of the site both necessitates the longer roadway length, and assures that no development in excess of the eight-lot maximum for single-access roads can be contemplated presently or in the future (such as future attempts to approve additional lots by proposing additional "Approval Not Required" lots pursuant to G. L. c. 41, § 81P). 





 C. The Board's Denial of the Waiver for Cul-De-Sac Geometry was Arbitrary and Capricious. 





 The Board's decision to deny the waiver for cul-de-sac geometry was arbitrary and capricious because it was based on the meaningless distinction as to whether the cul-de-sac was offset to the left, the right, or was centered. The Board's Rules and Regulations, in part, state the following requirements for dead-end streets: 





 Dead-end streets shall be provided at the closed end with a turnaround having an outside roadway diameter of at least one hundred and twenty (120) feet in diameter with a property line diameter of at least one hundred and forty (140) feet, the configuration of which is to conform to the typical cul-de-sac detail drawing. 





Subdivision Rules and Regulations, Section 405-9.E(2). [Note 53] Appendix B of the Rules and Regulations, entitled "Typical Cul-De-Sac Detail" ("Typical Detail") includes a drawing of a "typical" cul-de-sac, which is offset to the right in the drawing, and which provides the minimum radius requirements for cul-de-sacs. The radius requirements are as follows: an outer property line radius of 70 feet, an outside pavement radius of 60 feet, an inside pavement radius of 40 feet, and a center planted island, with a 20-foot pavement width for the access leading into the cul-de-sac. [Note 54] 





 The proposed Christmas Cove plan includes a cul-de-sac with an outer property line radius of 73 feet, a pavement radius on the outside of 60 feet, as well as a 20-foot pavement leading into the circular cul-de-sac - all of which are equivalent to, or greater than the dimensional requirements specified in the "Typical Detail" depiction in Appendix B of the Subdivision Rules and Regulations. [Note 55] In fact, there is no dispute that the Christmas Cove plans comply with the minimum dimensional requirements set forth in the Subdivision Rules and Regulations as shown in the Typical Detail. [Note 56] Rather, the Board argues that all proposed cul-de sacs must adhere exactly to the Typical Detail, which depicts a cul-de-sac that is offset to the right, as well as to the dimensional standards, while the proposed cul-de-sac is centered, and not offset to the right, and which exceeds the minimum dimensional requirements. 





 At trial, the Board asserted that any cul-de-sac which is not exactly the same as the Typical Detail, would require a waiver for cul-de-sac geometry. The Board's peer reviewer testified that in his experience, even if an applicant proposes a cul-de-sac that meets the dimensional requirements of the Rules and Regulations, a waiver is still required if the shape is not identical to the Typical Detail. [Note 57] That is, a cul-de-sac which is centered, or offset to the left instead of to the right, would require a waiver despite meeting the dimensional requirements detailed in the Subdivision Rules and Regulations. Marshfield Town Planner Gregory Guimond testified that both the shape and dimensions must mirror the provisions in the rules and regulations exactly, and accordingly, a waiver for cul-de-sac geometry is required for any subdivision cul-de-sac which is centered or offset to the left. The Board even went further at trial, arguing that a waiver is required even when cul-de-sacs exceed the requisite dimensional radii shown in the Typical Detail. [Note 58] 





 Oliva argues that there is no rational or meaningful difference between its centered cul-de-sac design and the design of the shape in the Typical Detail and for that reason, it was arbitrary and capricious for the Board to apply a different standard when reviewing the Christmas Cove plans. In support of this argument, Oliva points to its expert opinions that a centered cul-de-sac is equally as safe and functional as the Typical Detail design, and that those are the only legitimate concerns a Board can have under the Subdivision Control Law with respect to road design. In this case, the Board has not offered any rational reason why a centered versus offset cul-de-sac would result in safety concerns. Compare Montrose Sch. Park, LLC v. Dinkin, 23 LCR 34 , 40 (2015) (Long, J.) (denial of design waiver upheld where Board applied different measurement to proposed hammer-head cul-de-sac and circular cul-de-sacs). Nor was the issue raised by the Board's peer reviewer, Patrick Brennan, in his May 31, 2018 comment letter to the Board discussing the Christmas Cove plans, as revised. [Note 59] In fact, Brennan's May 31, 2018 letter stated that "all of our technical comments have been addressed," and there is no mention in the letter of any concern, or need for a waiver, related to the offset of the proposed cul-de-sac. [Note 60] Furthermore, during the project planning process, the Town recommended that Oliva make certain revisions to an earlier iteration of its yield plan - and those recommendations directly contradict the Board's interpretation and purported application of the Typical Detail requirement offered at trial. That recommendation was made by way of a suggested yield plan created by the Town Planner, Gregory Guimond, for Oliva (Exhibit 35). The suggested revision diagram depicts hand drawn markings made on a prior iteration of the Christmas Cove plan with a single access road of approximately 1,030 linear feet that opens into a looping road with frontage for eight lots. At the base of the access road from Highland Street, is a hand-drawn circular cul-de-sac, overlaying and terminating the loop road, indicating that the access road should terminate in a circular cul-de-sac with fewer lots, in order to conform to the Subdivision Rules and Regulations. At trial, Gregory Guimond testified that he drew this proposed revision to the proposed cul-de-sac design and that his recommended yield plan with a hand-drawn circular, centered cul-de-sac would not require a waiver for cul-de-sac geometry. [Note 61] As such, the Board's purported requirement that proposed subdivisions must conform exactly to its Typical Detail is not only illogical, but is also inconsistent with its prior recommendation made to the applicant for the Christmas Cove OSRD. Compliance with the "Typical Detail" requires adherence to the minimum radius requirements in the detail. Whether those requirements are met by a cul-de-sac that is centered or offset to the right or offset to the left has nothing to do with safety or quality engineering, rather, is determined instead by the geography and topography of the site. Accordingly, the Board's denial of the waiver for cul-de-sac geometry because the Christmas Cove cul-de-sac was centered, and not offset to the right, was both arbitrary and capricious. 





 D. The Board's Interpretation of the Requirement to Conform to the "Typical Detail" Is Legally Untenable. 





 Here, the Board's apparent definition of "typical" as synonymous with identical is not in accord with either the standard definition or the common understanding and usage of the term, and therefore is unreasonable. The Oxford dictionary defines "typical" as "[h]aving the distinctive qualities of a particular type of person or thing" and "characteristic of a particular person or thing." The Typical Detail provides the essential features of cul-de-sacs included in subdivisions - the minimum radii and measurements required to ensure vehicular clearance and therefore, public safety. Conforming to the Typical Detail means conforming to it in all material respects, meaning providing the minimum dimensional requirements, and not to the non-material aspects of the detail that do not even arguably affect safety, such as whether the cul-de-sac bulb is offset to either side or centered. To the extent the Board denied the proposed plan based on failure to have a cul-de-sac with an offset to the right, that decision was legally untenable because the Subdivision Rules and Regulations do not require such a narrow and illogical result. 





 E. The Board's Denial of the Waiver for Cul-de-Sac Geometry Was Also Based on Pretext and Was Otherwise Arbitrary. 





 The Board's treatment of three other subdivisions-Pine Oak Farm, Cranberry Cove, and Adelaide Way-demonstrates that the Board's application of the cul-de-sac offset requirements in the Subdivision Rules and Regulations was so inconsistent as to make its application to the Christmas Cove project arbitrary or to constitute evidence that its application to Christmas Cove was a pretext. In all three other instances, Pine Oak Farm, Cranberry Cove, and Adelaide Way, the Board approved subdivision plans with cul-de-sacs that were offset to the left and thus, different than the Typical Detail. For all three projects, no waiver was required for cul-de-sac geometry, with the Board finding that the cul-de-sac complied with the Bylaw and Subdivision Rules and Regulations. [Note 62] Because the Board required Christmas Cove to obtain a waiver for cul-de-sac geometry, which it then did not approve, but did not require the same waiver in three virtually identical circumstances, in which the proposed cul-de-sacs also were not identical to the offset shown in the Typical Detail, the application of the Board's Rules and Regulations was inconsistent and arbitrary and thus, the denial of the waiver was arbitrary and capricious. 





 F. The Christmas Cove Plan Does Not Require a Waiver from the Requirement that Stormwater Discharge Be No Closer than Fifty Feet to a Property Line. 





 The Board voted unanimously to deny a waiver from the requirement that stormwater discharge drains be no closer than fifty feet to a property line. The Christmas Cove OSRD plan shows a drain outlet that is forty feet from a property line. [Note 63] At trial, both of the plaintiff's engineers testified without contradiction that the drain in question, for which the Planning Board denied the waiver, is not a stormwater drain, but is instead a sub-drain for the collection and discharge of groundwater only. [Note 64] The distinction is significant, as the problems caused by high groundwater are different than the problems caused by stormwater discharge. Notably, stormwater discharge is a source of erosion, and groundwater discharge generally is not, because it does not flow as quickly as stormwater discharge. [Note 65] The waiver was unnecessary; the plan does not require the requested waiver, as it does not violate the rule prohibiting stormwater discharge within fifty feet of a property line. 





II. THE BOARD'S DENIAL OF THE OSRD SPECIAL PERMIT WAS LEGALLY UNTENABLE AND WAS UNREASONABLE, ARBITRARY AND CAPRICIOUS. 





Standard of Review - Special Permits. 





 The standard of review for a board's decision regarding a special permit is deferential, and after a de novo review, the court may only overturn a board's decision if it was "based on a legally untenable ground...or it is unreasonable, whimsical, capricious, or arbitrary." ACM Realty Mgmt., Inc. v. Planning Bd. of Westfield, 40 Mass. App. Ct. 242 , 246 (1996). The Appeals Court elaborated on these standards as a two-step approach in Britton v. Zoning Bd. of Appeals of Gloucester, 59 Mass. App. Ct. 68 (2003). First, the court determines if the board based its decision on a legally tenable ground, versus a "standard, criterion, or consideration not permitted by applicable by-laws or statutes." Id. This first step does not require judicial fact-finding; the court must simply determine if the board has used a standard that is in the bylaw or statute. The second step requires a factual review to determine "whether the board has denied the application by applying those criteria and standards in an unreasonable, whimsical, capricious, or arbitrary manner." Id. The "second element of review... is highly deferential...and gives the board discretion to deny a permit application even if the facts found by the court would support its issuance" provided that such a decision has a reasonable basis, which is supported by the record. PAV Props., Inc. v. Zaharoolis, 16 LCR 635 , 638 (2008) (Sands, J.), quoting Britton v. Zoning Bd. of Appeals of Gloucester, supra, 59 Mass App. Ct. at 74. 





 A special permit granting authority is required to make detailed findings in support of its decision. MacGibbon v. Bd. of Appeals of Duxbury, 347 Mass. 690 , 692 (1964) (board's decision must contain "definite statement of rational causes and motives, founded upon adequate findings"), citing Prusik v. Bd. of Appeal of Boston, 262 Mass. 451 , 458 (1928). Notwithstanding the requirement for detailed findings in general, and perhaps somewhat paradoxically, "the refusal of a board to grant a special permit...does not require detailed findings by the board." Schiffone v. Zoning Bd. of Appeals of Walpole, 28 Mass. App. Ct. 981 , 984 (1990). But this does not mean that the special permit granting authority is relieved of the requirement to state its reasons for the denial. Rather, it means that in the case of a denial of a special permit, "the requirement that the [special permit granting authority] provide reasons supporting its decision, is less demanding than if the [special permit granting authority] had acted affirmatively." Bd. of Aldermen of Newton v. Maniace, 429 Mass. 726 , 732 (1999). See also Gamache v. Town of Acushnet, 14 Mass. App. Ct. 215 , 220 (1982 (less rigorous findings required when denying relief). 





 When the reasons given by a special permit authority in support of a denial are merely conclusory, that is, "[w]hen a decision contains conclusions that do nothing more than repeat regulatory phrases, and are unsupported by any facts in the record, [the court is] constrained to conclude that the decision is 'unreasonable, whimsical, capricious or arbitrary,' and therefore invalid." Wendy's Old Fashioned Hamburgers of New York, Inc. v. Bd. of Appeal of Billerica, 454 Mass. 374 , 386 (2009). 





 Where the special permit granting authority fails to give any reasons at all in its decision, but offers reasons at trial, or offers reasons at trial that are different than those offered in its decision, the court is 'not obliged to search for facts in the record to support a rationale that the board did not itself provide. On review, the judge's role is to determine 'whether the reasons given' by the board, 'had a substantial basis in fact, or were, on the contrary, mere pretexts for arbitrary action or veils for reasons not related to the purposes of the zoning law'... [W]here no such reasons are given...a reviewing court cannot be satisfied that a board's actions are not arbitrary, a pretext, or otherwise impermissible." Id. at 387, quoting in relevant part, Vazza Properties, Inc. v. City Council of Woburn, 1 Mass. App. Ct. 308 , 312 (1973). In fact, a court need not entertain a board's efforts "to defend its denial of the special permits at trial based on grounds it had never articulated before." Cumberland Farms, Inc. v. Bd. of Appeals of Wellfleet, 90 Mass. App. Ct. 1118 (2016) slip op. at 2 (Rule 1:28 Unpublished Decision). 





 A decision is based on legally untenable grounds when premised "on a standard, criterion or consideration not permitted by the applicable statutes or by-laws. Here, the approach is deferential only to the extent that the court gives 'some measure of deference' to the local board's interpretation of its own zoning by-law. In the main, though, the court determines the content and meaning of statutes and by-laws and then decides whether the board has chosen from those sources the proper criteria and standards to use in deciding to grant or to deny the variance or special permit application." Britton v. Zoning Bd. of Appeals of Gloucester, supra, 59 Mass. App. Ct. at 73 (internal citations omitted). 





 Section 11.04.4 of the Bylaw provides the standard required for the issuance of a special permit for OSRD projects: "[t]he Planning Board may approve the development upon finding that it complies with the purposes and standards of the OSRD Bylaw and is at least equivalent to a conventional subdivision with regard to protection of natural features and scenic resources of the site." Section 11.04 provides for the purposes of the OSRD Bylaw: 





 The purpose of the Bylaw is to: allow for flexibility and creativity in the design of residential developments; encourage preservation of scenic vistas, natural resources and existing and potential municipal water supplies; facilitate construction and maintenance of streets, utilities and public services in a more economical and efficient manner; encourage a less sprawling form of development that consumes less open land and conforms to existing topography and natural features better than a standard subdivision; preserve open space areas for active and passive recreational use, including the provision of neighborhood parks and trails; encourage provision of diverse housing opportunities and integration of a variety of housing types; and further the goals and policies of the Town's comprehensive plan. 





Bylaw, Section 11.04, Purpose. [Note 66] In addition, Section 11.04.4 further provides that the Board shall consider the following criteria in making its decision: 





 i.) Upland open space as required by this Bylaw has been provided and generally conforms with Subsection 8 of this Bylaw. [Note 67] 





 ii.) Proposed streets have been aligned to provide vehicular access to each house in a reasonable and economical matter. Lots and streets have been located to avoid or minimize adverse impacts on open space areas and to provide views of and access to the open space for the lots. 





 iii.) Lots meet the applicable dimensional requirements of Subsection 5 of the OSRD Bylaw and the Marshfield Zoning Bylaws. 





Exhibit 24, Bylaw Section 11.04.4, Criteria for Special Permit Decisions. [Note 68] 





 In its Decision, the Board identifies the three criteria required to be considered for a special permit, and also includes additional findings relative to the special permit. In denying the special permit for the Christmas Cove OSRD subdivision, the Board made the following six findings: 





 Finding 1: The Planning Board finds by a vote of 3 in favor to 2 opposed that the Christmas Cove Open Space Residential Plan submitted showing 8 house lots complies with section 11.04.4 (Zoning Bylaw). [Note 69] The effect of this vote is a denial as to this finding. 





 Finding 2: The Planning Board finds by a vote of 2 to 3 that the Christmas Cove Open Space Residential Plan submitted provides greater protection of the natural features and Scenic resources than a conventional subdivision, section 11.04.4(a) 1.a. (Zoning Bylaws). The applicant had not finalized with the Conservation Commission for the long term protection and maintenance (including mowing of fields and paths, if determined by the Conservation Commission) of the turtle habitat. The effect of this vote is a denial as to this finding. 





 Finding 3: The Planning Board finds by a vote of 2 to 2 with 1 abstention that the Christmas Cove Residential Plan provides upland open space as required by this Bylaw and conforms to the subsection H of 11.04.4. The effect of this vote is a denial as to this finding. 





 Finding 4: The Planning Board finds by a vote of 2 to 3 that the Christmas Cove Open Space Residential Plan provides adequate access, proper street alignment, the lots have been located to minimize adverse impacts on the open space areas as required by this Bylaw and that it conforms to subsection H of 11.04.4. The effect of this vote is a denial as to this finding. 





 Finding 5: The Planning Board finds by a vote of 2 to 3 that the Christmas Cove Open Space Residential Plan lots meet the dimensional requirements of subsection E of 11.04.4. The effect of this vote is a denial as to this finding. 





 Finding 6: The Planning Board finds by a vote of 3 to 2 that the modified Christmas Cove Open Space Residential Plan submitted does comply with section 11.04.5 (Zoning Bylaws) providing the required thirty-foot buffer between the proposed building lots and the outside property line. The effect of this vote is a denial as to this finding. 





 With the possible exception of Finding 2, as discussed below, the above findings are not findings at all. By stating a positive finding, to the effect that the application meets the relevant standard, and then to simply say that the positive finding did not get the required supermajority vote, is to state no reason at all for the denial.





 In Finding 1, the Board stated generally that the proposed subdivision "complies with section 11.04.4" and then without further explanation, simply concluded that given the simple majority that voted in favor of this finding, the effect was a denial. The Board acknowledged by a vote of 3 to 2 that the proposed project met the Upland Open Space requirements of Bylaw 11.04.4 - which dictates the density and number of dwelling units permitted for OSRD projects, but added that because a supermajority vote was required, this vote amounted to a negative finding. [Note 70] However, the facts support only a positive finding on this issue. Bylaw Section 11.04.4 provides a straightforward formula for determining the allowable number of dwelling units for OSRD projects, which is based on the size of the project site. In this case, as discussed above, applying the formula in Section 11.04.4, the 17.68-acre project site yields a maximum of 15 dwelling units, though the Christmas Cove project proposes only eight dwelling units. [Note 71] 





 In its post-trial brief, the Board asserts that the denial of the special permit, that would include the technical denial of this finding, stemmed from the inaccurate yield plan, which, according to the Board, should have shown a maximum of three to four lots. Section 11.04.4 provides a formula for calculating the allowable density for OSRD projects; it does not speak to any purported yield plan requirement. Although the Decision states in a summary fashion that "two Board members felt a yield plan showing four lots around a standard cul-de-sac would have been in strict compliance without waivers," [Note 72] these concerns were not directly linked to the first finding, and they are unsubstantiated, and are also in direct conflict with the advice of the Town Planner in his 2015 comment letter [Note 73] regarding the proposed project. Furthermore, as described above in the section on the roadway length waiver, there is no basis for denying a roadway length that services an eight-lot subdivision under the facts shown at trial. 





 Contrary to the Board's argument, a proper yield plan, compliant with the Subdivision Rules and Regulations, could incorporate the need for a roadway length waiver, and could include as many as eight lots. A recurring theme in the Board's presentation at trial was the applicant's failure to submit a "yield plan" that accurately depicted the number of buildable lots on the Property and as a result, never created site plans based on the true allowable number of buildable lots - three or four - therefore, it was within the Board's discretion to deny [the roadway length] waiver. [Note 74] The Board argued at trial that an appropriate yield plan must depict the number of buildable lots available pursuant to a conventional subdivision plan without any waivers, and therefore the proposed yield plan (Exhibit 4), which incorporates the need for a roadway length waiver, is noncompliant and warrants denial of the OSRD project, special permit and waivers. This conclusion is unconvincing for several reasons. 





 There is actually no specific requirement in the Bylaw that an applicant submit a "yield plan" to demonstrate compliance with the requirements concerning the number of lots that will be permissible in a given OSRD. The apparently informal requirement for submission of a "yield plan" appears to come out of the requirement in Section 11.04.4 that, "[t]he number of dwelling units permitted shall not exceed that which would be permitted under a conventional subdivision that complies with the Marshfield Zoning Bylaws and the Subdivision Rules and Regulations..." [Note 75] There is nothing in this requirement to suggest that such a "conventional subdivision that complies" with the Subdivision Rules and Regulations must be one that does so without the benefit of waivers. A subdivision that is approved with waivers is one that complies with the Subdivision Rules and Regulations, as the Subdivision Rules and Regulations provide for the granting of waivers. 





 It is apparent that the Planning Board, until it took a contrary position to support its denial in this case, also has agreed with this interpretation in the past. Both the Pine Oak Farm OSRD and the Cranberry Cove OSRD are located, as is the Christmas Cove OSRD, in an R-1 rural residential zoning district, in which minimum lot size is 43,560 square feet and minimum frontage is 125 feet. [Note 76] I take judicial notice of the fact, and so find that it would be mathematically impossible for the applicants of either Pine Oak Farm or Cranberry Cove to have submitted a "yield plan" complying with the Planning Board's currently asserted interpretation of its own requirements. The Pine Oak Farm OSRD proposed, and was approved for, 19 building lots in an R-1 district. That would require 2,375 feet of frontage, or more than twice the frontage that would be provided by a non-waiver, maximum length dead-end road of no more than 600 feet. Similarly, Cranberry Cove, with 13 lots, and also in the R-1 zoning district, would have been required to show a yield plan demonstrating at least 1,625 feet of frontage on a 600-foot roadway, also a mathematical impossibility. 





 Accordingly, I find that the Planning Board's current interpretation of the requirement for determining the number of lots permissible in an OSRD is not only incorrect, but is inconsistent with the Planning Board's own interpretation as imposed on other OSRD subdivisions. For this reason, the Board's application of the "yield plan" requirements, to the extent it does not allow for a yield plan incorporating the need for a roadway length waiver, is both legally untenable because it is incorrect, and arbitrary and capricious because of the Planning Board's inconsistent application of the requirement. Since the denial of the roadway length waiver was improper under the circumstances of this case, a yield plan showing eight lots is proper and justified. Accordingly, as to Finding 1, specifically, there is no basis for the denial as the Board's finding was not reasonably supported by the facts, was arbitrary and capricious, and was based on a legally untenable standard. 





 For the other findings that addressed the specific standards imposed by the Bylaw, the Board was no less opaque than it was in making Finding 1. Section 11.04.4.i requires, "[u]pland open space as required by this Bylaw has been provided and generally conforms with Subsection 8 of this Bylaw." In addressing this requirement, the Board stated in Finding 3 that the proposed subdivision "provides upland open space as required by this Bylaw and conforms to the subsection H of 11.04.4," and then simply stated that this positive finding of compliance did not get the vote required to grant the waiver. The Board made no specific findings as to how the proposed plan failed to meet the requirement for upland open space as required by the Bylaw. I suspect the reason for this failure is because, as a matter of simple math, and as I so find, the proposal in fact did meet the Bylaw requirements for upland open space. 





 The evidence was undisputed that the proposed project would exceed the minimum amount of open space required for OSRD subdivisions, set forth in Bylaw Section 11.04 (5): "[a] minimum of 50% of the upland area of the parcel ('applicable land area') shall be provided as open space." [Note 77] To satisfy the open space requirement in the Bylaw, the proposed project was required to provide a minimum of 8.884 acres of open space (50%) of the 17.68-acre site. The Christmas Cove OSRD plans as submitted show that the project would provide 10.54 acres of open space, 59% of the 17.68-acre parcel. [Note 78] 





 In Finding 4, by finding in the negative that the plan "provides adequate access, proper street alignment, the lots have been located to minimize adverse impacts on the open space areas," the Board effectively found that the street alignment and access to the lots is improper without stating the basis of such a finding. I am not required to speculate as to the manner in which the Board believes the streets failed to properly align and provide proper access. However, the only reason even arguably suggested by the Board at trial was its argument that the center alignment of the cul-de-sac, as opposed to a right-offset entrance to the cul-de-sac, was somehow improper or less than safe. I have already concluded in the above discussion that the center alignment of the cul-de-sac complied with the Subdivision Rules and Regulations. Accordingly, the center-aligned cul-de-sac could not be the basis of a finding that the street on the plan is not aligned for proper access to the lots in the subdivision. It is not legally tenable for the Board to find that a subdivision plan does not provide proper alignment of streets when the alignment of streets shown on the plan complies with the Subdivision Rules and Regulations. As the Board offered no other reason for its negative finding with respect to street alignment, the Board's finding cannot stand. 





 Similarly, in Finding 5, the Board effectively concluded that the lots did not meet the minimum dimensional requirements for an OSRD subdivision, when the evidence is undisputed that the eight lots on the plan all meet the minimum frontage and area requirements of the Bylaw. Section 11.04 identifies the following dimensional requirements applicable to OSRD projects: minimum lot size of 15,000 square feet; minimum frontage of 75 feet, lot shape demonstrating a circle with the 75-foot front and rear setbacks; and setbacks of 15 feet from roadways and 30 feet from the outer perimeter of the site to serve as a buffer. [Note 79] The evidence was undisputed that the Christmas Cove OSRD subdivision plan as revised and proposed, satisfies each of the dimensional requirements in Section 11.04. [Note 80] 





 With respect to Finding 6, the plan also shows without question that the required thirty foot buffer between the lots and the outside property line has been provided, and the Board so conceded at trial. [Note 81] The Board erred outright in its denial of this finding because the project plans clearly depict a buffer that exceeds 30 feet between the lots and property line. [Note 82] 





 Finally, in Finding 2, the only finding in which the Board stated an actual reason for a negative finding, the Board based its negative finding, with respect to greater protection of natural features than would be the case in a conventional subdivision, on the applicant's failure to complete permitting with the Conservation Commission for protection of wildlife habitats prior to appearing in front of the Planning Board. While a planning board may properly require an applicant to obtain all other approvals required by law, a board may not deny an application because of the applicant's failure to obtain the approval prior to the planning board's decision. The Board's finding on this issue not only illogical, it is also impermissible, as the Supreme Judicial Court has observed in another statutory context. "It would make little practical sense to condition the application for one such approval...on the successful application for another approval." Mahajan v. Department of Environmental Protection, 464 Mass. 604 , 622 (2013). 





CONCLUSION 





 For the foregoing reasons, I find and rule that the Board's decision denying the requested waivers and denying approval of the OSRD special permit was legally untenable, arbitrary, capricious, unreasonable, and otherwise beyond the proper exercise of the Board's lawful authority. The decision of the Board is therefore ANNULLED. 





 Furthermore, this being one of "those rarely encountered points where no rational view of the facts the court has found supports the [special permit granting authority]'s conclusion that the applicant failed to meet one or more of the relevant criteria found in the governing statute or by-law," Britton v. Zoning Bd. of Appeals of Gloucester, supra, 59 Mass. App. Ct. at 74-75, an order requiring the issuance of the requested special permit is appropriate. An order for the issuance of a special permit is "appropriate where remand is futile or would postpone an inevitable result." Wendy's Old Fashioned Hamburgers of New York, Inc. v. Bd. of Appeal of Billerica, supra, 454 Mass. 374 at 388. See also Shirley Wayside Limited Partnership v. Bd. of Appeals of Shirley, supra, 461 Mass. at 474, 485. 





 Judgment will enter annulling the decision of the Board and ordering the approval of the requested waivers and issuance of the OSRD special permit. 





FOOTNOTES
[Note 1] Additional findings of fact are contained in the discussion section, infra. 

[Note 2] Trial Exhibit ("Exh.") 5, Special Permit Application dated November 6, 2017. 

[Note 3] Exh. 15, Christmas Cove Site Plan Set Final Review May 23, 2018, at pp. 1, 7. 

[Note 4] Exh. 3, Application Overall Site Plan w/o Buffer dated October 6, 2017; Exh. 15. 

[Note 5] Exh. 14, Marshfield Zoning Bylaw, Section 6.10 (PDF p. 45). 

[Note 6] Exh. 25, Subdivision Rules and Regulations, Section 405-2, Purpose (PDF p. 3). Pursuant to a post-trial stipulation, the parties clarified that on July 25, 2017, the Board voted to update the Rules and Regulations. The update modified the numbering scheme but did not result in any substantive changes to the Rules and Regulations. Despite this update, the Board processed the subject project under the prior version of the Rules and Regulations (Exhibit 25). To avoid further confusion, the court will refer to the version of the Rules and Regulations that was applied by the Board when it issued its decision on October 30, 2017. 

[Note 7] Exh. 24, Marshfield Zoning Bylaw, Section 11.04 (PDF pp. 75-81). 

[Note 8] Parties' Post-Trial Stipulation, Tab 6: Marshfield Planning Board Rules and Regulations Governing OSRD ("OSRD Rules and Regulations"),(PDF p. 260). 

[Note 9] Exh. 25, Subdivision Rules and Regulations, Section 405-8, Definitive Plans p. 405:28 (PDF p. 28). 

[Note 10] OSRD Rules and Regulations, Section 4.2.d (Stipulation, PDF p. 261). 

[Note 11] Exh. 24, Zoning Bylaw, Section 6.10, Density and Dimensional Requirements (PDF p. 45), Section 11.04, Special Permit Conditions for OSRDs (PDF p. 75). 

[Note 12] Exh. 15, Christmas Cove final proposed site plans (PDF pp. 1, 8, 11, 13). 

[Note 13] Exh. 8, Sitec Letter re Resubmittal of OSRD Application; Exh. 4, Yield Plan; Exh. 15, Christmas Cove Plans (PDF pp. 7, 10, 12); Trial Transcript ("Tr.") Vol. I p. 24. 

[Note 14] Exh. 24, Bylaw, Section 11.04, OSRD Density/Number of Dwelling Units (PDF p. 76). 

[Note 15] Exh. 15 (PDF pp. 1, 7). 

[Note 16] Exh. 4, Yield Plan; Parties' Post-Trial Stipulation. 

[Note 17] Exh. 4; Tr. Vol. I p. 161. 

[Note 18] Exh. 25, Section 405-9.E, Dead-end Streets (PDF p. 43). 

[Note 19] Id. 

[Note 20] Exh. 25, Appendix B "Typical Detail" of Cul-De-Sacs (PDF p. 68). 

[Note 21] Exh. 25, Subdivision Rules: Waivers (PDF p. 59). 

[Note 22] Exh. 22, Marshfield Planning Board Decision dated October 30, 2018 re the Christmas Cove OSRD Special Permit and Definitive Subdivision. 

[Note 23] Exh. 22; Exh. 25 (PDF p. 43). 

[Note 24] Exh. 22; Exh. 25 (PDF p. 43). 

[Note 25] Exh. 22; Exh. 25 (PDF p. 47). 

[Note 26] Exh. 22, pp. 1-2. 

[Note 27] Exh. 22. The Board granted four other waivers that are not at issue in this action. In its Decision, the Board granting the following four waivers: 1) elimination of one sidewalk (waiver no. 3); 2) installation of vertical granite curbing for all curves with a radius of 60 feet or less (waiver no.5); 3) placement of utility lines to differ from the Typical Roadway cross-section (waiver no. 6); and 4) to allow a water line in excess of 800 feet without looping (waiver no. 7). 

[Note 28] At the direction of the Court, the Parties' submitted a Post-Trial Stipulation to clarify discrepancies in the numbering system of the Subdivision Rules and Regulations raised during the trial. Per the stipulation, on July 27, 2017, the Board adopted an updated version of the Subdivision Rules, which reflected a revised numbering scheme but was otherwise substantively unchanged. The Christmas Cove project plans (Exhibit 15) were reviewed and processed pursuant to the prior Rules, and thus, the Board's Decision (Exhibit 22) as well as the Christmas Cove plans (Exhibit 15) reflect the section numbers of the prior Rules. For example, "Streets" in the prior Rules was Section 4.1 while the updated Rules (Exhibit 25) includes "Streets" in Section 405-9 (discussed at trial, Tr. Vol. I pp. 90-92). 

[Note 29] Exh. 22. 

[Note 30] The parties are in agreement that waiver number four, for storm water discharge location, is no longer in dispute, and accordingly will not be addressed further. 

[Note 31] Exh, 22 p. 4. 

[Note 32] Exh. 22 p. 5. 

[Note 33] Exh. 22 p. 2. 

[Note 34] Exh. 30, Decision by the Board approving the Pine Oak Farm OSRD subdivision (waivers 2 and 5); Exh. 29, Pine Oak Farm OSRD plans. 

[Note 35] Exh. 31, Board's Decision approving the Cranberry Cove OSRD (waivers 5 and 3); Exh. 32, Cranberry Cove OSRD plans 2011. 

[Note 36] Exh. 33, Decision approving the Adelaide Way Definitive Subdivision (waivers 8 and 5, respectively). 

[Note 37] Exh. 33, Adelaide Way Decision, waiver 7 (PDF p. 4): "Section 4.1.4.f Way lines shall be parallel or concentric, and the roadway shall be centered in the layout. Details and dimensions shown in the typical cross-sections in Appendix A shall be complied with. Finding: Due to the steep topography of the buildable portion of the site, the applicant proposes a modification of the roadway cross section (sidewalk location) to maximize grade transition and buffer landscaping on the abutter's (Southern) side. The Board finds the combination of the existing topography, the projection of important wildlife habitat and the connection of existing town and private open space through the donation of 28 acres of the site to the Conservation Commission warrants the granting of this waiver. The Board voted 5 to 0, to approve this waiver." 

[Note 38] Exh. 25 (PDF p. 43). 

[Note 39] Exh. 25, Waivers: Subdivision Control Law (PDF p. 59). 

[Note 40] Testimony of Patrick Brennan ("Brennan Testimony"), Tr. Vol. II pp. 18-19. 

[Note 41] Exh. 3; Tr. Vol. I pp. 54, 58-59. 

[Note 42] Exh. 25 (PDF p. 4) (emphasis added). 

[Note 43] Brennan Testimony, Tr. Vol. II p. 19. 

[Note 44] Exh. 4. 

[Note 45] Exh, 30, Planning Board Decision approving special permit for Pine Oak Farm project. 

[Note 46] Exh. 30 (PDF p. 2). 

[Note 47] Exh. 33 (PDF p. 4). 

[Note 48] Brennan Testimony, Tr. Vol. II pp. 19, 23. 

[Note 49] Exh. 25, Section 405-9, Design Standards and Required Improvements, Streets, which states: "[n]o area of single access as defined in Article II shall provide access to more than eight dwelling units total" (PDF p. 41). 

[Note 50] Exh. 31, Decision for the Cranberry Cove OSRD; Tr. Vol I p. 112; Tr. Vol. II p. 50. 

[Note 51] Exh. 15; Tr. Vol. I p. 98. 

[Note 52] Brennan Testimony, Tr. Vol. II p. 86. 

[Note 53] Exh, 25, p. 42. 

[Note 54] Exh. 25, App. B (PDF p. 68). 

[Note 55] Exh. 25 (PDF p. 68). 

[Note 56] Planning Board's Post-Trial Brief pp. 17-18; Exh. 15. 

[Note 57] Brennan Testimony, Tr. Vol. II pp. 32-33. 

[Note 58] Testimony of Gregory Guimond ("Guimond Testimony"), Tr. Vol. II pp. 99-100. 

[Note 59] Exh. 17, Brennan Comment Letter regarding revised Christmas Cove plans dated May 31, 2018. 

[Note 60] Id. 

[Note 61] Guimond Testimony, Tr. Vol. II pp. 95-97 (Q. And you drew this as an example of a cul-de-sac that would not require waivers?...A. Correct). 

[Note 62] Exh. 29, Pine Oak Farm OSRD Plans; Exh. 32, Cranberry Cove OSRD Definitive Subdivision Plans 2011; Brennan Testimony, Tr. Vol. II p. 27. 

[Note 63] Exh. 15; 

[Note 64] Testimony of Jeffrey Couture ("Couture Testimony") Tr. Vol. I, p. 25: "I mean that discharge is actually discharging what I believe to be a street underdrain, so that is groundwater and not stormwater...it's not technically stormwater, it's groundwater." 



 Testimony of John O'Leary, Jr., ("O'Leary Testimony") Tr. Vol. I, p. 71: "This is a subdrain. It has no surface inlet. It picks up groundwater and discharges groundwater only." 



[Note 65] O'Leary Testimony, Tr. Vol. I, p. 70: "[Groundwater discharges] don't flow very fast, so they do not create erosion issues. Whereas, a stormwater discharges, if not properly designed, can create erosion issues and affect the downgrading (sic) properties with such erosion." 

[Note 66] Exh. 24 (PDF p. 75). 

[Note 67] Exh. 24 (PDF pp. 76, 80). Subsection 8 sets Design Requirements for OSRD projects. These include in part, "planning open space as large, contiguous areas whenever possible..." and that, "open space shall be arranged to protect valuable natural and cultural areas such as stream valleys, wetland buffers... wildlife habitat, open fields, scenic views,..." and further, a "development plan shall take advantage of the natural topography of the parcel and cuts and fills should be minimized." For all design requirements, see Zoning Bylaw Section 11.04.8 (a)-(g) (PDF pp. 80-81) 

[Note 68] Exh. 24 (PDF pp. 76-77). 

[Note 69] Per the Parties' Post-Trial Submission, Bylaw Section 11.04.4 required the adoption of the OSRD Rules and Regulations (not introduced as evidence but submitted by the parties as an attachment to the post-trial stipulation). See Stip., Tab 6 (PDF p. 260) and specifically, subsection 4.2, Contents of Application (PDF p. 261). 

[Note 70] Exh, 24 (PDF p. 76); Exh. 15, Christmas Cove plans (PDF pp. 1-5). 

[Note 71] Exh. 24 (PDF p. 76); Exh. 15. 

[Note 72] Exh. 22 (PDF p. 4). 

[Note 73] Brennan Testimony, Tr. Vol. II pp. 43-44. 

[Note 74] Guimond Testimony, Tr. Vol. II pp. 88-90. 

[Note 75] Exh. 24. 

[Note 76] Exhs. 29, 32, Pine Oak Farm plan and Cranberry Cove OSRD plans, respectively. 

[Note 77] Exh. 24, Bylaw Section 11.04 (5) (PDF p. 78). 

[Note 78] Exh. 15 (PDF p. 1); Tr, Vol. I pp. 79, 93. 

[Note 79] Exh. 24 (PDF p. 77). 

[Note 80] Exh. 15 (see "Lotting Plan" (PDF p 7)). 

[Note 81] Tr. Vol. I p. 96 (Court, Q: Mr. Riley, can I assume that you agree on this one too, that as a technical matter, the 30-foot buffer called for in the bylaw is provided on the plan... A: Yes.) 

[Note 82] Exh. 15. 


 
 Home/Search 
 Land Cases by Docket Number
 Land Cases by Date 
 Land Cases by Name
 


 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.